COPLAY CEMENT COMPANY, INC.,
Plaintiff–Appellee/Cross–
Appellant,

v.

WILLIS & PAUL GROUP,
Defendant–Appellant,

and

Cresswell Roll Forming, Inc.,
Defendant–Appellee/Cross–
Appellant.

Nos. 92–1145, 92–1259 and 92–1284.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 17, 1992.

Decided Jan. 21, 1993.

Ronald R. Fifer, Stites & Harbison, Jeffersonville, IN, J. Scott Greene, Stites & Harbison, Louisville, KY (argued), Cecile A. Blau, Jeffersonville, IN, for Coplay Cement Co., Inc.

Michael Rosiello (argued), James A. Smith, Barnes & Thornburg, Indianapolis, IN, for Cresswell Roll Forming, Inc.

William P. Donelan (argued), H. Thad White, Jr., Columbia, SC, John W. Doehrman, Jeffersonville, IN, for Willis & Paul Group.

Before POSNER and FLAUM, Circuit Judges, and ZAGEL, District Judge.[*]

POSNER, Circuit Judge.

This diversity suit, though based on an esoteric Indiana statute governing the relations between owners and subcontractors, raises fundamental issues, procedural and contractual, concerning the doctrine of set-off and the distinction between a single contract and multiple contracts. The facts are simple enough. Coplay Cement Company decided to rebuild the electrostatic precipitators at two of its Indiana plants—the plants at Speed and at Logansport. It drew up specs, received bids, and on the basis of the bids issued separate purchase orders for the two jobs, both to Southeast Precip, Inc., at a price of almost $500,000 per job. Southeast turned around and subcontracted the provision of labor on both jobs to the Willis & Paul Group and the provision of materials on both jobs to Cresswell Roll Forming, Inc. The work at Logansport was completed without incident and the electrostatic precipitator there is up and running properly. At Speed, however, Willis & Paul made a mistake in welding steel plates furnished by Cresswell, and as a result Coplay had to hire another firm to rebuild the precipitator for another half million dollars.

Coplay filed this suit for breach of contract against Southeast, naming the two subcontractors as additional defendants. They—not having received full payment for their work at either Speed or Logansport, because Coplay had held back from the amount due Southeast the estimated cost of having the precipitator at Speed re-rebuilt—counterclaimed under what is known as the "personal liability" section of Indiana's mechanics' lien law. Ind.Code § 32–8–3–9. This section provides that upon notice to the owner by a subcontractor (mechanic, materialman, etc.) of the subcontractor's claim against the contractor (confusingly termed "employer"), the owner shall be liable to the subcontractor for that claim up to the amount that the owner owes the contractor. Adding further confusion, the personal-liability section appears in the mechanics' lien chapter of the liens article of the Indiana Code yet does not create a lien, that is, a secured interest; the subcontractors are unsecured creditors of the owner. *Barker v. Buell,* 35 Ind. 297, 302 (1871); *Colter v. Frese,* 45 Ind. 96, 99 (1873); *Lee & Mayfield, Inc. v. Lykowski House Moving Engineers, Inc.,* 489 N.E.2d 603, 607–08 (Ind.App.1986); *In re Hull,* 19 B.R. 501, 506–10 (Bankr. N.D.Ind.1982); see generally John A. Grayson, "Mechanics' and Materialmen's Liens," West's Ann.Ind.Code § 32–8–3 at pp. 17–18 (1979).

Southeast Precip, the contractor, being broke and assetless, defaulted, and Coplay, the owner, abandoned its claims against the subcontractors. The remaining issue concerned the statutory rights of the subcontractors against Coplay. After a bench trial, the district judge held that Cresswell could but Willis & Paul could not assert rights under the statute, and he awarded judgment to Cresswell against Coplay for more than $200,000. All three parties appeal—Coplay challenging the award to

---

[*] Hon. James B. Zagel of the Northern District of Illinois, sitting by designation.

Cresswell, on the ground that it (Coplay) is entitled to offset the greater amount that it lost as a result of Southeast's default at Logansport, Willis & Paul challenging the denial of any award to it, Cresswell challenging the judge's refusal to award it prejudgment interest.

The personal-liability law is designed to protect the subcontractor against the consequences of the contractor's absconding or going broke or otherwise defaulting. It does this by allowing the subcontractor, upon proper notice, to collect directly from the owner. It thus differs from a mechanics' lien law, which by creating a secured interest gives a subcontractor priority over the owner's unsecured creditors. *O.J. Shoemaker, Inc. v. Board of Trustees*, 479 N.E.2d 1349, 1351 (Ind.App.1985). Indiana mechanics' lien law, moreover, does not, at least in so many words, limit the subcontractor's lien to the amount that the owner owes the contractor. Ind.Code §§ 32–8–3–1 *et seq.* Thus *Baldwin Locomotive Works v. Edward Hines Lumber Co.*, 189 Ind. 189, 125 N.E. 400 (1919), describes the law as conferring upon the mechanic or materialman a direct right against the owner's property rather than a right derivative from the contractor's right against the owner. That is an old case, however. A recent one, although from a lower court, interpolates the limitation—but does so without discussion. *Clark's Pork Farms v. Sand Livestock Systems, Inc.*, 563 N.E.2d 1292, 1298–99 (Ind.App.1990).

■ We need not pursue the issue. However it be resolved when a mechanics' lien is in question, under the personal-liability section the subcontractor's right is limited to the amount that the owner owes the contractor. The statute says as much— "The owner shall be liable for such claims, but not to exceed the amount which may be due … from him to the" contractor, Ind. Code § 32–8–3–9, as do the cases interpreting it. *Colter v. Frese, supra*, 45 Ind. at 104; *Pioneer Lumber & Supply Co. v. First–Merchants National Bank*, 169 Ind. App. 406, 349 N.E.2d 219 (1976); *Blade Corp. v. American Drywall, Inc.*, 400 N.E.2d 1183, 1186 (Ind.App.1980). The

right created by the personal-liability section is strictly a derivative one. But not necessarily a less valuable one. Subcontractors cannot always take advantage of the right to file a mechanics' lien. An owner can contract with the general contractor for a "no lien" clause that will be binding upon subcontractors and other mechanics and materialmen, provided the clause is recorded. Ind.Code § 32–8–3–1. The personal-liability section gives a subcontractor an alternative means to a mechanics' lien of shifting from himself to the owner the burden of the general contractor's financial difficulties.

Given the derivative character of the personal-liability section, however, the critical question, as far as the subcontractors' claims are concerned, is what Coplay owed Southeast on the contract, or perhaps the contracts, of which Cresswell and Willis & Paul were subcontractors. The answer may seem to turn on whether there was one contract or two. If the two purchase orders should be treated as a single contract for the rebuilding of the precipitators at the Speed and Logansport plants, then all Coplay owed Southeast was the purchase price minus the portion held back to cover the damages caused by the screw-up at Speed; and that amount, the net amount owed, fell so far short of the subcontractors' claims that, if Coplay is entitled to deduct its damages, the subcontractors can get nothing. If they were two separate contracts, however, it can be argued that Coplay owed Southeast the full purchase price for the Logansport job, which was completed without incident, and that the subcontractors are entitled to collect the money for the services that they rendered on that job, albeit not on the other one. Oddly, in view of his action in rendering judgment for Cresswell, the district judge ruled that there was a single contract. But he held that it would be inequitable to allow Coplay to hold back payment from Cresswell, whose services on both jobs were flawless and whose service at Logansport conferred an unequivocal, undiluted benefit on Coplay.

We can't follow this reasoning. The statute is clear. The owner is liable to

subcontractors only up to the amount that he owes the general contractor. If there was one contract, the hold-back for damages at Speed cut down Coplay's obligation to Southeast, and hence its derivative obligation to Cresswell, no matter how worthy the latter's services.

But what if there was more than one contract? We are not at all certain that this should change the result. The statute makes no reference to the number of contracts between the owner and the contractor, and it is unclear why, in light of the purpose of the statute or other pertinent considerations, the number should make a difference; but the parties agree that it may, so we shall soldier on.

■ Whether there was one contract or two depends in the first instance on the terms of the contract(s), construed with the aid of Indiana's rules of contractual interpretation, such rules being considered substantive under the *Erie* doctrine, *Cooper Laboratories, Inc. v. International Surplus Lines Ins. Co.*, 802 F.2d 667, 672 (3d Cir.1986), because, like the parol evidence rule and the Statute of Frauds, they are concerned primarily with "the channeling of behavior outside the courtroom," *Barron v. Ford Motor Co.*, 965 F.2d 195, 199 (7th Cir.1992), rather than with the allocation of responsibilities among judicial decision-makers (trial and appellate judges, and jurors). The rule in Indiana as elsewhere is that if the meaning of a written contract can be inferred from its terms, the judicial inquiry stops there; extrinsic evidence (for example, testimony by the negotiators of the contract concerning their intentions) is inadmissible. *First Federal Savings Bank v. Key Markets, Inc.*, 559 N.E.2d 600, 604 (Ind.1990). This is the "four corners" rule, which is related although not identical to the parol evidence rule. *Patton v. Mid-Continent Systems, Inc.*, 841 F.2d 742, 745 (7th Cir.1988). If, however, the contract cannot be interpreted without recourse to other evidence besides its language, that is, extrinsic evidence, then such evidence is admissible. *First Federal Savings Bank v. Key Markets, Inc., supra*, 559 N.E.2d at 604.

■ It is also the law of Indiana that in the first type of case the interpretation of the contract is treated as a ruling on a question of law, and appellate review is therefore plenary, while in the second type interpretation is treated as a determination of fact, and appellate review is therefore deferential. *Id.* But the decision whether a question is one of law or fact, and the correlative decision whether appellate review shall be searching or modest, is not one governed by state law, even in diversity cases. Involving as it does the division of functions between judge and jury and between trial and appellate judges—both matters internal to the federal judicial system—it is a matter controlled by federal law. *Agfa–Gevaert, A.G. v. A.B. Dick Co.*, 879 F.2d 1518, 1521 (7th Cir.1989); *Cooper Laboratories, Inc. v. International Surplus Lines Ins. Co., supra*, 802 F.2d at 671; cf. *Abernathy v. Superior Hardwoods, Inc.*, 704 F.2d 963, 970–71 (7th Cir. 1983). The federal rule, which is similar to Indiana's rule, is that if the only evidence of the meaning of a contract is the written contract itself, interpretation is a matter of law, *Agfa–Gevaert, A.G. v. A.B. Dick Co., supra*, 879 F.2d at 1521, for the trial judge to make subject to plenary appellate review, while if other evidence needs to be consulted interpretation is for the trier of fact. *Western Industries, Inc. v. Newcor Canada Ltd.*, 739 F.2d 1198, 1205 (7th Cir. 1984). This is a case of the second type. The characterization of a pair of documents as one contract or two cannot ordinarily be determined merely by gazing at them unless they *say* they are one contract or two, which in this case they don't. One must look behind the face of the contracts.

■ We acknowledge a tension between *Newcor* and a line of cases illustrated by *Lumpkin v. Envirodyne Industries, Inc.*, 933 F.2d 449, 456 (7th Cir.1991); see also *LaSalle National Bank v. General Mills Restaurant Group, Inc.*, 854 F.2d 1050, 1052 (7th Cir.1988). *Newcor* teaches that contractual interpretation is a jury question if several contractual documents have to be compared with each other and with extrinsic evidence in order to determine the con-

tract's meaning, while the *Lumpkin* line holds that if the extrinsic evidence is undisputed, the determination of the meaning of the contract remains a matter of law. There is no direct conflict. *Newcor* does not consider what difference it makes whether the extrinsic evidence is disputed or not. *Lumpkin* could therefore be viewed as carving an exception to the general principle of *Newcor* that contract interpretation is a factual issue when extrinsic evidence is presented. Yet the rule is that disputes over inferences from uncontested evidence, as well as disputes over the evidence itself, are for the trier of fact to resolve, subject to the limited appellate review encapsulated in the term "clearly erroneous." Cf. *Pullman–Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982); *Mucha v. King,* 792 F.2d 602, 605 (7th Cir.1986). When the judicial task is to infer meaning from disparate bits of evidence, some textual, some testimonial, none contested in themselves but the aggregate forming a confused mosaic, it is a task more appropriate for a trier of fact than for a declarer of legal rules. *Restatement (Second) of Contracts* § 212(2) (1979); E. Allan Farnsworth, *Contracts* § 7.14 at pp. 538–39 (2d ed. 1990). A different conclusion would greatly curtail the prerogatives of juries and trial judges. Evidence is the stuff that the trier of fact sees, hears, or reads, inferences the factual propositions that he elicits or constructs from the evidence. The resolution of both evidentiary and inferential contests is a proper responsibility for the trier of fact because both are contests about the facts.

The extrinsic evidence in this case is not disputed, so if we followed *Lumpkin* we would treat the question of contractual meaning as one of law rather than of fact, and we would conclude that the district judge had misconstrued the contracts in finding them to be one rather than two. But even if, as we suggested was preferable, we treated the question of contractual meaning as one of fact, governed therefore by the clearly-erroneous standard of appellate review, we would be constrained to conclude that the district judge had erred in finding that the two contracts were real-

ly one; for the error seems clear to us. Therefore we need not make a definitive choice between the two approaches.

■ Although the parties talk confidently about the existence of a contract "doctrine" that distinguishes between single and multiple contracts and would thus enable us to resolve the issue here by applying that doctrine to the facts, they cite few cases. We have found only a few more. We would have supposed that the issue whether parties had one contract or two would arise frequently in cases involving statute of limitations, breach, mitigation, remedies, or conditions, but in fact the issue seems to arise infrequently and the cases discussing it, most of which are old, have not crystallized an identifiable doctrine, though the term "divisibility" is sometimes used to name the issue. E.g., *Prospero Associates v. Burroughs Corp.,* 714 F.2d 1022, 1026–27 (10th Cir.1983). Most of the reported cases involve conditions; one party's breach of contract may excuse the other from performing, but it will not excuse the other from the performance due from him under a separate contract between the parties unless of course performance under the one contract is conditioned expressly on performance under the other. *Harton v. Hildebrand,* 230 Pa. 335, 79 Atl. 571 (1911); *Bethea v. Investors Loan Corp.,* 197 A.2d 448 (D.C.Ct.App. 1964); 3A Arthur Linton Corbin, *Corbin on Contracts* § 696 (1951); see also 4 *id.,* §§ 952–53. Unfortunately the authorities do not lay down a rule or standard for deciding whether a series of transactions constitutes one contract or two. What is needed is a simple default rule, so that contracting parties know where they stand if they fail to specify that they are entering into one contract or more than one. The simplest and best rule that we can think of is that if the transactions are embodied in separate documents, each complete in itself, in the sense that ascertaining the terms does not require consulting the document for the other transaction, they are separate contracts. That is not Indiana's rule. Indiana has no rule—because it has

no cases on the question. We are left to our own devices.

■ Each purchase order is indeed complete in itself, and we need go no further since the negotiating history is hopelessly inconclusive on the matter. On the one hand, it's not as if Coplay had said to Southeast, it's time to rebuild my precipitators and here's the contract to do so. Coplay has six cement plants. It decided, for slightly different reasons, to rebuild the precipitators at two of the plants, which are in different counties. It issued requests for bids separately on both. Southeast happened to be the low bidder on both. It signed two purchase orders, with different price and other terms. On the other hand, one reason Southeast got the two contracts is that it offered Coplay a $25,000 discount if it got both; that suggests a package deal, which might be thought to make the two contracts "really" one. *Bethea v. Investors Loan Corp., supra,* 197 A.2d at 450. There is no really about it, and we prefer our simple rule.

It is a sensible rule, and not only because of its simplicity. Whether two contracts—or at any rate what a lay person would be inclined to call two contracts—entered into at the same time between the same parties for similar undertakings should be classified as two contracts or one is not a question of fact in the sense of being answerable by taking evidence. It is a question of classification. Classification is a purposive enterprise. There must be a *reason* for wanting to lump together what to a lay person would seem clearly two contracts, and if the only reason is to avoid having to decide whether Coplay should as a matter of statutory interpretation or efficiency or equity or practicality or whatever be allowed to shift the costs of the Speed disaster to the innocent (or for that matter the guilty) subcontractor, it is not a good reason. The issue should be faced head-on. The two-contract finding permits this. The doctrine of setoff, for example, may, as Coplay argues, permit it to subtract its claim on the Speed contract from what it owes on the Logansport contract. Or may not. Shifting the focus of inquiry from the number of contracts to the question of setoff will bring to the fore the practical considerations bearing on the question of how to allocate the loss that occurred as a result of Willis & Paul's mistake and Southeast's collapse.

■ But is there a doctrine of "setoff" or is it as ghostly as the "one contract/two contract" doctrine? Even before the term "counterclaim" was given currency by the promulgation of the Federal Rules of Civil Procedure in 1938, a defendant could seek to reduce its liability by pleading that the plaintiff owed it money. The plea was called "recoupment" if the plaintiff's debt to the defendant arose out of the same transaction as the defendant's liability to the plaintiff, and "setoff" if it did not. So recoupment is the ancestor of the compulsory counterclaim (Fed.R.Civ.P. 15(a), Ind.R.Trial P. 13(A)) and setoff of the permissive counterclaim (Fed.R.Civ.P. 15(b), Ind.R.Trial P. 13(B)). 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1401 at pp. 10–11 (2d ed. 1990). Although as a procedural device the setoff has been supplanted by the permissive counterclaim, the term is sometimes used in a substantive or remedial sense that is very near to the lay sense of the word, to mean an offset to liability, a netting out of opposing claims. *Trust Services of America, Inc. v. United States,* 885 F.2d 561, 566 (9th Cir.1989) (equitable setoff allows the government to reduce a tax refund by the amount of any improper deduction); Ind.Code § 34–1–48–18 (a defendant in an ejectment suit can set off the value of his permanent improvements against the plaintiff's damages); *Marshall v. Bird,* 577 N.E.2d 254 (Ind.App.1991). It is natural therefore for courts in cases under the personal-liability section of the mechanics' lien law to speak of setting off the owner's claims against the subcontractors', since the owner is liable only up to the net amount that he owes the contractor. *Templeton v. Sam Klain & Son, Inc.,* 425 N.E.2d 89, 94 (Ind.1981); *Pioneer Lumber & Supply Co. v. First–Merchants National Bank, supra,* 169 Ind.App. at 413, 349 N.E.2d at 223–24; *Blade Corp. v. Ameri-*

*can Drywall, Inc., supra*, 400 N.E.2d at 1186.

Setoff survives as a distinctive doctrine—something different from a permissive counterclaim, on the one hand, or a name for the netting of opposing claims, on the other hand—only in banking and in bankruptcy. In the banking industry, setoff denotes a security interest that the law recognizes by allowing the bank to deduct the depositor's debt to it before other creditors can reach the account. *First Bank v. Samocki Bros. Trucking Co.*, 509 N.E.2d 187, 198–99 (Ind.App.1987); *First National Bank v. American Fletcher National Bank & Trust Co.*, 480 N.E.2d 964 (Ind. App.1985); 5A *Michie on Banks and Banking* §§ 113–151, at pp. 335–459 (1983). And the Bankruptcy Code contains a complex provision regulating the rights of debtors of a bankrupt to set off the debts of the bankrupt to them. 11 U.S.C. §§ 506(a), 553.

Although the doctrine of setoff has an equitable lineage—it dates back to the seventeenth-century chancery court's jurisdiction over bankruptcy, William H. Lloyd, "The Development of Set–Off," 64 *U.Pa. L.Rev.* 541, 547–50 (1916)—it was grafted onto the common law by statute in the eighteenth century. 2 Geo. II c. 22, § 13 (1729); 8 Geo. II c. 24, § 4 (1735). By the time it turned into the permissive counterclaim, it had lost all its equitable foliage—had become, so far as it retained any doctrinal form at all, a purely procedural doctrine. Only in banking and in bankruptcy, the two contexts in which as we said setoff retains its substantive or remedial distinction, do equitable considerations sometimes surface, *Riggs v. Government Employees Financial Corp.*, 623 F.2d 68, 74 n. 3 (9th Cir.1980); *In re Braniff Airways, Inc.*, 42 B.R. 443, 448, 452 (N.D.Tex.1984); 4 *Collier on Bankruptcy* ¶ 553.02, at p. 553–13 (Lawrence P. King ed. 1992)—though this court has deprecated the use of such considerations to answer setoff questions in bankruptcy. *In re Iowa R.R.*, 840 F.2d 535, 536 (7th Cir.1988); *Boston & Maine Corp. v. Chicago Pacific Corp.*, 785 F.2d 562, 565–66 (7th Cir.1986).

This is not a banking or a bankruptcy case, so we can simplify and modernize the analysis by asking whether, if Southeast, the general contractor, rather than the subcontractors had sued Coplay for the money that Coplay owes for the successful completion of the Logansport project, Coplay could have counterclaimed for the damages it incurred as a result of Southeast's breach of contract at Speed. The answer is of course yes. A permissive counterclaim by definition arises from a different contract or other transaction or occurrence from the main claim, and a setoff, so far as relevant here, is just a subset of the permissive counterclaim.

Were equitable considerations relevant, which they aren't, we would point out that there is nothing inequitable about the setoff, or equivalently the hypothetical counterclaim, in this case. Instead of having to pay Southeast for the successful completion of the contract Logansport, get a judgment from Southeast for the failure at Speed, and try to collect that judgment from Southeast out of the money just paid to Southeast for Logansport, Coplay would economize on collection costs by deducting what it was owed in damages for Speed from what it owed (the balance of the purchase price) for Logansport. Though in fact Coplay sued Southeast, it didn't have to, and in fact the suit was futile, ending in an uncollectable default judgment. Setoff would have enabled the parties, that is to say Coplay and Southeast, to settle their dispute without litigation, since Southeast owed Coplay more than Coplay owed Southeast yet could not make good the difference.

 If setoff would have been proper in litigation between Coplay and Southeast, Cresswell and Willis & Paul lose. Setoff means that Coplay did not owe Southeast the full price of the Logansport contract. What it did not owe Southeast, it did not owe the subcontractors, be they as pure as the driven snow, as Cresswell appears to be. We repeat that it is not the purpose of the personal-liability law to shift the burden of the general contractor's bankruptcy from the subcontractors to the owner, but

merely to place the subcontractor in the place that the general contractor would have occupied in a lawsuit with the owner. We acknowledge contrary authority from Iowa, *Beane Plumbing & Heating Co. v. D–X Sunray Oil Co.*, 249 Iowa 1364, 92 N.W.2d 638, 642 (1958), but the opinion contains no discussion of the question. And we find support in *Pioneer Lumber & Supply Co. v. First–Merchants National Bank, supra.* It is true that in *Pioneer Lumber* the two contracts allowed to be set off one against the other were so closely related that they could easily be classified as one, but the court did not find it necessary to take that step.

We point out the analogy to the assignment of a contractual right. The assignee (for which read the subcontractors in our case) stands in the shoes of the assignor and therefore takes the assignment subject to any defenses against the assignor's (for which read Southeast's) claim that arose before the assignment was made, Farnsworth, *supra*, § 11.8, at pp. 809, 816–17, and often after, provided it was before the party obligated on the contract that was assigned was notified of the assignment. *Restatement, supra*, § 336(2). The defects in the Speed project came to light in February of 1989, and it was not until June that Cresswell and Willis & Paul exercised their rights under the personal-liability law by notifying Coplay that they were stepping into Southeast's shoes. Coplay's defense thus arose before the subcontractors gave the required statutory notice, Ind.Code § 32–8–3–9, and so could be asserted against them, just as if they had been assignees of Southeast. Cf. *Indianapolis Power & Light Co. v. Southeastern Supply Co.*, 146 Ind.App. 554, 571, 257 N.E.2d 722, 732 (1970).

We have discussed the issue of setoff at such length because it has been the focus of the parties' dispute, but it is not organic to the personal-liability section and we might have decided the case the same way if there were no concept of setoff or if it were inapplicable to the case—as well it might be. Suppose there had been no breach of contract at Speed, but Coplay simply had not paid Southeast in full for the work at Speed when the latter went broke but had paid Southeast in full for the work at Logansport. If the subcontractors had brought suit against Coplay for the balance due them for the work at Speed, pointing out that Coplay still owed money to the contractor albeit under a different purchase order and, we have held, a different contract, there would be no issue of setoff because Coplay would have no claim against the contractor or the subcontractors. The personal-liability section might however entitle the subcontractors to collect up to the amount that Coplay owed Southeast. As we mentioned earlier, nothing in the section suggests that the owner's liability is limited to the amount he owes the contractor under the particular contract that had been subcontracted to the subcontractor who is seeking to collect his claim from the owner.

The symmetry between the rights of subcontractors and of owners under the statute is reinforced by noting that although in this case the right to set off a credit on one contract against a debit on another operates to the benefit of the owner, it need not always or even generally do so. For example, were Coplay suing Willis & Paul for damages incurred at Speed, Willis & Paul could in defense set off the money owed to it on Logansport even though the work at Speed and at Logansport was performed under different contracts. The shoe is on the other foot here only because it is the subcontractors that are seeking payment and the owner that is seeking to offset the damages incurred under one of the contracts. As those damages exceed the amounts claimed by the subcontractors under both contracts, the subcontractors are entitled to nothing. The judgment is therefore affirmed insofar as it dismisses Willis & Paul's claim, but is reversed as to Cresswell with instructions to enter judgment for Coplay against both subcontractors. Cresswell's appeal is dismissed as moot in light of our disposition of the other appeals.