**In re ABC–NACO, Inc., et al., Debtors.**

**No. 01 B 36484.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

July 1, 2003.

Steven B. Towbin, Peter J. Roberts, Shaw, Gussis, Fishman, Glantz, Wolfson & Towbin, LLC, Chicago, IL, for Debtors.

Alexander Terras, Thomas J. Magill, Jason N. Kaplan, Quarles & Brady, LLC, Chicago, IL, for Deloitte & Touche, Inc. and GE Capital Canada Leasing Services, Inc.

## MEMORANDUM OF DECISION

EUGENE R. WEDOFF, Chief Judge.

These administratively consolidated Chapter 11 cases have come before the court on the request of the receiver of a wholly owned Canadian subsidiary of one of the debtors for payment of an administrative expense, pursuant to § 503 of the Bankruptcy Code (Title 11, U.S.C.). The debtors oppose the request. Among other things, they assert claims of setoff or recoupment, contending that any right to payment that the Canadian subsidiary holds against the debtor corporation is more than offset by amounts that the Canadian subsidiary owes to the debtor. The receiver of the Canadian subsidiary disagrees, arguing (1) that setoff is unavailable because the subsidiary's claim arose during the pendency of these bankruptcy cases, whereas the debtor's claim arose before the bankruptcy, thus depriving the claims of "mutuality" needed for setoff; (2) that recoupment is unavailable because the claims did not arise out of the same transaction; and (3) that recognition of either setoff or recoupment would constitute an inequitable preference in favor of the debtor. Because the question of whether the debtor should be allowed to assert its off-

setting claim would have a significant impact on the hearing of the request for payment of administrative expense, the parties agreed to brief the issue for ruling by the court before any evidentiary hearing.

As discussed below, the position of the Canadian receiver is incorrect. First, under modern American practice, "setoff" and "recoupment" are simply names given to permissive and compulsory counterclaims, respectively, and debtors in bankruptcy are subject to no special substantive requirements in asserting counterclaims. Second, whether recognition of the offsetting claim asserted by the debtor would constitute a preference in a bankruptcy of the Canadian subsidiary is a question that could only be determined by the court presiding over such a bankruptcy; it cannot be a basis for this court's refusal to consider the debtor's claim. Accordingly, an interim order will be entered denying the Canadian receiver's objections to hearing the debtor's claim against the subsidiary.

### Jurisdiction

Federal district courts have exclusive jurisdiction over bankruptcy cases. 28 U.S.C. 1334(a). Pursuant to 28 U.S.C. 157(a), district courts may refer bankruptcy cases to the bankruptcy judges for their district, and, by Internal Operating Procedure 15(a), the District Court for the Northern District of Illinois has made such a reference of the pending cases. When presiding over a referred case, a bankruptcy judge has jurisdiction, under 28 U.S.C. 157(b)(1), to enter appropriate orders and judgments in core proceedings within the case. The pending request for payment of an administrative expense, as well as the debtor's offsetting claim, are core matters under 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate), (b)(2)(B) (allowance or disallowance

of claims against the estate), and (b)(2)(C) (counterclaims by the estate against persons filing claims against the estate). This court therefore has jurisdiction to enter a final ruling in the matter now before it.

### Findings of Fact

The relevant facts are alleged in the request for administrative payment and in the debtors' response asserting an offsetting claim. While certain of these facts may be subject to dispute, they are all assumed to be true here in order to allow resolution of the question of whether this court should hear the offsetting claim.

The bankruptcy cases now pending before this court were filed October 18, 2001 by ABC–NACO Inc. and seven of its subsidiary corporations, including National Castings, Inc., (NCI), all of which are in the business of supplying products to the rail industry. (ABC–NACO and its filing subsidiaries will be referred to collectively as "the American debtors".) Not joining in these proceedings was another subsidiary of ABC–NACO, Dominion Castings Limited, a Canadian corporation. Dominion Castings, however, was soon involved in a Canadian receivership, commenced on November 21, 2001, about five weeks after the American debtors' filings. In the Canadian proceeding, the Superior Court of Justice of the Province of Ontario appointed Deloitte & Touche interim receiver, with duties—including collection of whatever sums might be owing to Dominion Castings from the American debtors—defined by court order.

After filing their cases in this court, the American debtors remained in possession of their assets and continued to operate their businesses as debtors-in-possession. During the roughly five weeks between their bankruptcy filings and the commencement of Dominion Castings' receivership proceeding, one of the American debtors, NCI, purchased goods from Do-

minion Castings worth more than $1.6 million (US), of which approximately $814,000 remains unpaid. Also after their bankruptcy filings, the American debtors used equipment that Dominion Castings leased from GE Capital Canada Leasing Services, Inc., without paying Dominion Castings. Dominion Castings values the use of the equipment at about $50,000 per month.

Based on the balance owing to Dominion Castings for goods shipped to NCI and on the American debtors' use of Dominion Castings' leased equipment, Deloitte & Touche, as receiver, filed in this court the pending request for payment of an administrative expense. GE Capital Canada Leasing Services joined in the request. In response, the American debtors asserted, among other things, that prior to the filing of the bankruptcy cases, NCI entered into agreements with Dominion Castings under which NCI provided licenses of intellectual property, technical assistance, and management services, and that Dominion Castings had outstanding liabilities to NCI under these agreements of nearly $4.2 million—more than enough to offset completely any amounts owed by NCI or the other American debtors in connection with Deloitte & Touche's request for administrative payment. These liabilities, the American debtors contend, should serve to eliminate Dominion Castings' claims under doctrines of setoff or recoupment.

The parties engaged in discovery, and the court held a pretrial conference in the matter. In connection with that conference, Deloitte & Touche asserted that the American debtors should not be allowed to assert setoff or recoupment (1) because the allegedly offsetting contract claims of NCI arose before its bankruptcy filing, whereas Dominion Castings' claims arose after the filing, rendering the two sets of claims non-mutual and not subject to setoff; (2)

because the transaction on which NCI's claim was based is different from the transactions for which Dominion Castings seeks payment, precluding recoupment; and (3) because recognizing a setoff would result in an avoidable preference, and hence be inequitable.

Because it appeared that resolution of the legal questions raised by Deloitte & Touche would advance resolution of the entire dispute between the parties, they agreed to submit these questions for ruling before a trial of factual matters in dispute.

### Conclusions of Law

■ The legal questions raised by the parties require an understanding of the law regarding setoff and recoupment. In modern American legal practice, setoff and recoupment are largely archaic terms, referring to old forms of pleading now treated simply as counterclaims. In *Coplay Cement Co. v. Willis & Paul Group*, 983 F.2d 1435, 1440 (7th Cir.1993), the court provided a succinct summary of this legal development, referencing the somewhat longer treatment in 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice Procedure* 1401 at 10–11 (2d ed.1990):

> Even before the term "counterclaim" was given currency by the promulgation of the Federal Rules of Civil Procedure in 1938, a defendant could seek to reduce its liability by pleading that the plaintiff owed it money. The plea was called "recoupment" if the plaintiff's debt to the defendant arose out of the same transaction as the defendant's liability to the plaintiff, and setoff if it did not. So recoupment is the ancestor of the compulsory counterclaim (Fed. R.Civ.P. 15(a) [sic, 13(a)]) ... and setoff of the permissive counterclaim (Fed. R.Civ.P. 15(b) [sic, 13(b)]). : ...

Wright, Miller & Kane also note that while the common law imposed various

requirements for claims to be asserted by way of setoff or recoupment (including requirements of relatedness between the offsetting claims), modern practice has removed these limitations "to facilitate the adjudication of all disputes that exist between the parties to an action." *See id.,* 1401 at 10.[1] The Federal Rules of Bankruptcy Procedure, in Rule 7013, add to the flexibility of Fed.R.Civ.P. 13 by providing that if a trustee or debtor in possession excusably fails to plead a timely compulsory counterclaim, the court may allow the counterclaim to be pursued by amendment or in a separate proceeding.

Thus, unless there is some reason not to apply the general rule allowing counterclaims, NCI would be allowed to assert its claim against Dominion Castings in response to Dominion Castings' administrative expense claim against NCI and the other American debtors. Dominion Castings does suggest such reasons, but they are not applicable here.

■ *1. The impact of the American bankruptcy proceedings.* As the court in *Coplay* noted, there are two exceptions to the general proposition that the old forms of setoff and recoupment have been subsumed into modern counterclaim procedure and no longer exist as substantive legal doctrines. *Coplay,* 983 F.2d at 1441. One exception deals with bank deposits, where a doctrine of "banking setoff" allows a bank an interest in the funds deposited by its customers to secure payment of the customers' debts to the bank. *Id.* The other exception is in bankruptcy—"[T]he Bankruptcy Code contains a complex provision regulating the rights of debtors of a bankrupt to set off the debts of the bankrupt to them. 11 U.S.C. §§ 506(a), 553." *Id.* The substantive impact of the "bankruptcy setoff" is to grant a higher priority to unsecured claims against a bankruptcy estate where the claimholder is owed money by the estate.[2]

■ Such a setoff can be of substantial value, since it allows the creditor of an estate in bankruptcy, whose claim might be paid little or nothing from the bankruptcy estate, to use that claim to reduce, dollar for dollar, a debt to the estate that would otherwise be fully payable for the benefit of other creditors. It is not clear why the special bankruptcy setoff provisions were adopted.[3] However, regardless

---

1. Illinois procedure reflects the same development in the law. *See* 735 ILCS 5/2–608: Counterclaims. (a) Any claim by one or more defendants against one or more plaintiffs, or against one or more codefendants, whether in the nature of setoff, recoupment, cross claim or otherwise, and whether in tort or contract, for liquidated or unliquidated damages, or for other relief, may be pleaded as a cross claim in any action, and when so pleaded shall be called a counterclaim.

2. Specifically, § 553(a) of the Code allows a creditor, under defined circumstances, "to offset a mutual debt owing by such creditor to the debtor," and § 506(a) recognizes the special position of "[a]n allowed claim of a creditor ... that is subject to setoff under section 553" by according the claim secured status, thus preventing the debtor from seeking to satisfy the claim by a less than complete payment before collecting the estate's claim against the creditor.

3. The Seventh Circuit has noted that "[a]lthough the right of set off [sic] has been part of Anglo–American bankruptcy law since 1705, *see* Act of 4 Anne, ch 17, § 11, its rationale has never been made clear." *In re Elcona Homes Corp.,* 863 F.2d 483, 485 (7th Cir.1988). And the court went on to reject two common explanations for the right:

   To say that it "recognize[s] the possible injustice in compelling a creditor to file its claim in full and accepting possible dividends thereon, while at the same time paying in full its indebtedness to the estate," 4 Collier on Bankruptcy ¶ 553.02, at p. 553–10 (King 15th ed.1988) (footnote omitted), is to say very little; for why is it not an

of the rationale, a creditor's ability to obtain the higher priority accorded by a bankruptcy setoff has been made subject to substantive limits, including the requirement of "mutuality." Among its other requirements, § 553(a) allows a bankruptcy setoff only if both the creditor's claim against the estate and the estate's claim against the creditor arose before the filing of the debtor's bankruptcy case.[4]

■ "Recoupment" exists in bankruptcy as a judge-made exception to the mutuality requirement, allowing a creditor to offset a postpetition obligation to the debtor with a claim that arose prepetition, as long as both involved the same transaction. *Ashland Petroleum Co. v. Appel (In re B & L Oil Co.)*, 782 F.2d 155, 157 (10th Cir.1986).

Deloitte & Touche has seized upon these alternative requirements to argue that NCI cannot properly assert its claim against Dominion Castings in response to Dominion Castings' administrative claims because (1) the debts are not mutual (NCI's claim arose before NCI's bankruptcy filing, whereas Dominion Castings' claim arose after), precluding setoff, and (2) the claims arose out of different transactions, precluding recoupment.

■ These arguments fail because they apply only to the special substantive claim of setoff or recoupment available to a *creditor* in bankruptcy. NCI, a debtor, obviously is not asserting a claim against its own bankruptcy estate, so the special bankruptcy rights of setoff and recoupment are irrelevant here. NCI is simply using the counterclaim procedure to assert a claim against Dominion Castings in bankruptcy court that it might have asserted in some other forum had it not filed bankruptcy. Far from imposing limits on a debtor's ability to assert such a counterclaim, the applicable provisions of federal law reinforce it. As noted earlier, 28 U.S.C. § 157(b)(2)(C) provides that a bankruptcy judge has core jurisdiction over counterclaims by a bankruptcy estate against a person who has filed a claim against the estate, thus allowing the bankruptcy court to issue a final judgment in a matter as to which it might otherwise have only been authorized, under its "related to" jurisdiction, to issue proposed findings for consideration by the district court. *See In re Baudoin*, 981 F.2d 736, 741 (5th Cir.1993) ("A response to a proof of claim which is, in essence, a counterclaim, is a core proceeding under 28 U.S.C. § 157(b)(2)(C)"). And to the extent that

---

equal or greater injustice to advance one unsecured creditor over another merely because the first happens also to owe money to their common debtor? Nor is it helpful to point out that "it is only the balance which is the real and just sum owing by or to the bankrupt," *Prudential Ins. Co. v. Nelson*, 101 F.2d 441, 443 (6th Cir.1939), for if the set off [sic] is allowed, the other unsecured creditors will not receive "the real and just sum owing" to them.
*Id.*

4. In *Boston & Maine Corp. v. Chicago Pacific Corp.*, 785 F.2d 562, 565–566 (7th Cir.1986), the court provided a rationale for this mutuality requirement, based on the need to protect viable reorganizations:

An example makes the point. Suppose a post-bankruptcy firm has monthly accounts receivable of $100,000 and monthly accounts payable of $95,000.... This firm should survive, notwithstanding its prior bankruptcy.... Suppose, however, $10,000 of the receivables are owed by someone who was a creditor of the pre-bankruptcy firm. If the creditor can offset the new obligations against the old debt, the post-bankruptcy firm will fail. It cannot go on collecting $90,000 and paying $95,000 monthly. The setoff produces the failure of a firm that should succeed. The creditor of the old firm who happens to do business with the new firm will get a higher payoff on old debt than does another creditor of the old firm who never owes a debt to the new one.

the right to file a counterclaim is seen as a "defense" to a creditor's claim, that right is expressly preserved by § 558 of the Bankruptcy Code: "The estate shall have the benefit of any defense available to the debtor as against any entity other than the estate...."

Accordingly, almost all of the reported decisions addressing the issue have held (1) that, generally, claims asserted by a debtor under the Bankruptcy Code are not subject to the limitations applicable to a creditor's right to a bankruptcy setoff or recoupment, and (2) that, specifically, a debtor's counterclaim against a creditor does not require mutuality in the sense of both claims arising prepetition. *See, e.g., In re PSA, Inc.,* 277 B.R. 51, 53 (Bankr. D.Del.2002); *In re Papercraft Corp.,* 127 B.R. 346, 350 (Bankr.W.D.Pa.1991); *In re M.W. Ettinger Transfer Co.,* 1988 WL 129334 at *3–*4 (Bankr.D.Minn.1988); *In re Standard Furniture Co.,* 3 B.R. 527, 531 (Bankr.S.D.Cal.1980). One reported decision to the contrary, *In re Braniff Airways, Inc.,* 42 B.R. 443, 447–48 (Bankr. N.D.Tex.1984), has properly been criticized for failing to address the policy difference between creditor claims to setoff under § 553 and counterclaims by an estate under § 558. *See M.W. Ettinger,* 1988 WL 129334 at *4.

*2. The impact of the Chicago Pacific decision.* Disagreeing with the legal analysis and the authorities set out above, Deloitte & Touche relies principally on *Boston & Maine Corp. v. Chicago Pacific Corp.,* 785 F.2d 562 (7th Cir.1986). *Chicago Pacific,* however, involved railroad reorganizations under the Bankruptcy Act of 1898, and it provides little guidance in determining the counterclaim rights of a debtor under the Bankruptcy Code.

A review of the background of *Chicago Pacific* makes clear its inapplicability to the present case. The debtor in Chicago Pacific was the corporation formerly known as the Rock Island Railroad. Before filing its own bankruptcy case, the Rock Island was a creditor in the bankruptcy of another railroad, the Boston & Maine ("B & M"), holding a prepetition claim of $180,000 for "interline balances." The Rock Island argued in the B & M bankruptcy that interline balance claims were required to be paid in full, but the court presiding over the bankruptcy disagreed; the First Circuit affirmed; and the Rock Island was allowed only a general unsecured claim for its interline balances. As such, the claim received a 10% dividend under the B & M's confirmed plan of reorganization. Meanwhile, the Rock Island had filed its own bankruptcy case, and thereafter incurred $100,000 in interline balance obligations to the B & M. In the Rock Island bankruptcy, there was sufficient cash to pay all claims in full, but the Rock Island sought to satisfy its $100,000 postpetition obligation to the B & M by asserting its $180,000 prepetition claim against the B & M as an offset. Section 68(a) of the Bankruptcy Act of 1898, former 11 U.S.C. § 108(a), provided that "[i]n all cases mutual debts and mutual credits between the estate of a bankrupt and the creditor shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid." The district court allowed the Rock Island to set off its prepetition interline balance claim against the postpetition claim of the B & M under this provision. The Seventh Circuit reversed, holding that the conflicting claims—since they did not both arise prior to the Rock Island bankruptcy— were not mutual for purposes of § 68(a). *Chicago Pacific,* 785 F.2d at 564.

Section 68(a) of the Bankruptcy Act was the predecessor of § 553 of the Code, setting out the Act's provisions for the special "bankruptcy setoff." Unlike § 553, howev-

er, § 68(a) did not expressly limit its application to claims asserted by creditors. Thus, the Rock Island could plausibly assert a right to setoff under § 68(a), and the Seventh Circuit could note that the section was inapplicable because of the lack of mutuality. Here, as already noted, the American debtors are not asserting any right to setoff under § 553, and the limitations of the bankruptcy setoff, including mutuality, are simply not at issue. *Chicago Pacific* is not relevant.[5]

■ *3. The impact of Dominion Castings' Canadian receivership.* The remaining reason Deloitte & Touche offers for not allowing NCI to present its claim against Dominion Castings is that recognition of NCI's claim would be a preference in Dominion Castings' receivership. Certainly there is that potential. Deloitte & Touche cites §§ 95 and 96 of Canada's bankruptcy law, the Bankruptcy and Insolvency Act, R.S.C.1985, c.B–3 (as amended S.C.1992, c. 27) (the "BIA") as containing provisions similar to those of § 547 of the U.S. Bankruptcy Code. These sections do appear to provide for avoidance of payments or transfers of property to an insider, made within a year "before the date of the initial bankruptcy event," that have the effect of enabling the insider to receive more than it would have through a distribution of the debtor's assets in the bankruptcy proceeding. And a judgment in favor of NCI on its counterclaim could result in such a preferential transfer.

However, the possibility that a judgment on NCI's counterclaim might be preferential in a Canadian bankruptcy of Dominion Castings provides no basis for this court to refuse to consider the counterclaim. Any determination of a preferential transfer can only be made in the context of a pending bankruptcy of the transferor, where the court would consider all of the factors relevant to the determination (including the time of the transfer relative to the filing of the bankruptcy case, and any affirmative defenses, such as a contention that the transfer occurred in the ordinary course of business). And despite its citation of Canadian bankruptcy law, Deloitte & Touche has never asserted that Dominion Castings is involved in a pending bankruptcy case.[6]

---

**5.** Had the Rock Island simply asserted a counterclaim against the B & M in the *Chicago Pacific* case, the issues this case presents might have been raised, but the assertion of such a counterclaim would have exposed the deeper problem with the Rock Island's position: its claim against the B & M had been raised, adjudicated, and deemed satisfied in the B & M bankruptcy. A counterclaim by the Rock Island, in short, would have baldly asked the Chicago bankruptcy court to allow full payment of a claim that the Boston bankruptcy court had determined should not be paid in full. Only because of the Rock Island's improper invocation of § 68(a) was it unnecessary for the Seventh Circuit to reach the question of whether such relitigation would be appropriate. *See Chicago Pacific,* 785 F.2d at 564 ("We need not consider whether the Chicago court has the power to do what it did, because we conclude that substantive principles of bankruptcy law do not permit a setoff.").

**6.** If Dominion Castings were the debtor in a Canadian bankruptcy case, an automatic stay, like that of the U.S. Bankruptcy Code, would prohibit prosecution of claims against the debtor's estate, and this court would almost certainly honor that stay. *See Banyan Licensing, Inc. v. Orthosupport International, Inc.,* 2002 WL 31059365 at *2 (N.D.Ohio 2002) (recognizing the automatic stay imposed by § 69 of the BIA, and noting that "American courts routinely extend comity to the actions and judgments of Canadian bankruptcy courts"); *Badalament, Inc. v. Mel–O–Ripe Banana Brands, Ltd.,* 265 B.R. 732, 736–38 (E.D.Mich.2001) (recognizing the Canadian stay and observing that "[c]ourts have consistently extended comity to Canadian bankruptcy proceedings").

Rather than a bankruptcy pursuant to the BIA, in which all claims against Dominion Castings might be asserted, it appears that the receivership proceeding in which Dominion Castings is currently involved is directed to protecting the interests of GE Capital Canada Leasing Services, which, according to Deloitte & Touche, instituted the receivership. The differences under Canadian law between a bankruptcy and a receivership are described in 6A *Norton Bankr.L & Prac.2d* § 152:55 at 152–128 to 152–129 (1994):

> Receivership as a remedy is not synonymous with bankruptcy.... Bankruptcy is essentially intended to protect the interests of unsecured creditors by having the debtor's unencumbered property divided proportionately among his creditors.... [R]eceivership is a creditor's remedy which is most often intended to protect the interests of a secured creditor by requiring the involuntary repayment of an indebtedness.
>
> ....
>
> .... [Receivership] is usually granted on the application of a secured creditor holding security on the debtor's property. The extent of the powers exercisable by the receiver and the scope of his authority are matters which are within the jurisdiction of the appointing court.

Moreover, the source of Canadian receivership jurisdiction is distinct from that of bankruptcy.

> [J]urisdiction to appoint a receiver over a business is a matter of provincial, rather than federal, law and does not involve the federal government's bankruptcy jurisdiction. The provincial jurisdiction is based on statutory provisions that allow the court to appoint a receiver, where, simply, the court is persuaded that it is "just and convenient" for a receiver to be appointed.

E. Bruce Leonard, *The International Year in Review,* 19 Am. Bankr.Inst. J. 24, 24 (2001).

Thus, it does not appear that there is any pending bankruptcy of Dominion Castings in which either NCI could assert the claim against Dominion Castings that it seeks to raise in the present cases, or a court might find that the satisfaction of NCI's claim by way of an offset would be an avoidable preference. In the absence of such a proceeding, there is again no reason why this court should not hear NCI's claim.

### Conclusion

For the reasons set forth above, the Court rules on an interim basis that the claim asserted by the debtor National Castings, Inc. (NCI) against Dominion Castings Limited, in response to the latter's request for an administrative payment, is a claim that may properly be heard and determined by this Court. A separate order will be entered to this effect.