Arnold J. ANSFIELD, Trustee in Bankruptcy of Peter Arvo Mackie, Bankrupt, Plaintiff,

v.

WHITEWATER OIL COMPANY, Inc., a Wisconsin corporation, Defendant.

No. 62–C–234.

United States District Court
E. D. Wisconsin.

May 19, 1966.

---

Milton M. Cohn, Milwaukee, Wis., for plaintiff.

Alan J. Rogers, of Rogers & Rogers, Whitewater, Wis., for defendant.

GRUBB, District Judge.

This action was commenced by the trustee in bankruptcy of Peter Arvo Mackie, bankrupt, to recover from the defendant, Whitewater Oil Company, Inc., $2,336.48, which is the alleged value of certain goods, merchandise and equipment transferred by the bankrupt to the defendant on or about November 6, 1961. Mackie was adjudicated bankrupt in the Eastern District of Wisconsin on a voluntary petition filed December 8, 1961. The complaint alleges that the transfer in question constitutes a voidable preference under Section 60 of the Bankruptcy Act and the case was tried to the Court on that theory.

In order that a preference may be set aside in a plenary suit by the trustee, he must establish (1) a transfer of the debtor's property; (2) to or for the benefit of the creditor; (3) made or suffered while the debtor is insolvent; (4) within four months of bankruptcy; (5) for or on account of an antecedent debt which results in a depletion of the debtor's estate; and (6) with the effect to enable the creditor to obtain a greater percentage of his debt than he would be entitled to under the distributive provisions of the Bankruptcy Act. Moskowitz v. Nelson, 218 F.Supp. 710 (E.D. Wis. 1963).

The order following a pretrial conference held April 1, 1964 set forth the following stipulations made between the plaintiff and the defendant: (1) that prior to November 6, 1961, the bankrupt owed the defendant approximately $6,-500.00; (2) that the bankrupt and the defendant had some negotiations on the last day of October 1961 which resulted in the bankrupt and the defendant agreeing upon an inventory of goods, merchandise, and equipment which was turned over to the defendant by the bankrupt on November 6, 1961. As noted before, the adjudication of bankruptcy was made on December 8, 1961.

The same order following the pretrial conference of April 1, 1964 delineated the following factual issues for determination at the trial: (1) What was the valuation of the goods, merchandise, and inventory transferred? The defendant claims that the figure of $2,336.48 was a valuation made contingent upon the bankrupt agreeing to pay the defendant the entire amount owed by the bankrupt to the defendant. The plaintiff contends that this figure is binding on the parties here as a matter of law. (2) Was the bankrupt insolvent on November 6, 1961? (3) If the bankrupt was insolvent on November 6, 1961, was that fact known or should it have been known to the defendant?

The determination of these issues requires an examination of the situation involving the bankrupt and the defendant before the transfer involved in this action.

The bankrupt was a filling station operator and the defendant was an oil jobber. In June 1958, the defendant leased a filling station to the bankrupt. Prior to the execution of this lease, the defendant's president, Willard R. Thayer, told the bankrupt that it would take about $2,000.00 to get going in the station. The bankrupt indicated that he might be able to borrow the money from his father-in-law to finance the operation. The bankrupt did secure this financing and began operation of the station in June 1958.

There was to be no rent charged during the first two years of the operation. The

station was supplied with an inventory of gas, oil, tires, and accessories valued at approximately $2,800.00. There was no definite agreement as to how the bankrupt was to pay for the gas, oil, tires, and accessories obtained from the defendant other than that the bankrupt would turn over credit card invoices to Thayer. The bankrupt did this about once a week and would also pay money to the defendant, if he could afford it.

The defendant sent monthly statements to the bankrupt. These reflected an increasing account. Between six and nine months after the station opened Thayer first talked to the bankrupt about his account being too large. The account at this time was between eight and nine thousand dollars. The bankrupt told Thayer that he didn't have that amount of money available, but that he would try to borrow it. The defendant continued to supply the bankrupt with products. Once a week or so, Thayer would inquire about payment. The bankrupt borrowed $4,-000.00 from his father-in-law to apply to the account. The bankrupt told Thayer about the source of this money. After this payment was made, the defendant continued to supply products to the bankrupt. At the trial, Thayer testified that he continued to supply the bankrupt when he knew he shouldn't.

Further payments were made by the bankrupt to the defendant by check. Some of these, approximately thirty-five of them extending over a year's period commencing in November 1960, were returned to the defendant by its bank marked not sufficient funds. The bankrupt told Thayer that he would try to make good on the checks by collecting some accounts receivable.

About one year before the bankrupt went out of business, the defendant put him on a cash basis. The bankrupt told Thayer that he was having financial difficulties, that he was in debt to others, and that he was not operating the station profitably. In May 1961, the bankrupt was under continued pressure to meet his obligations to the defendant. He told

Thayer that he was borrowed to the hilt but that he would try to raise some money. He obtained $2,000.00 by refinancing his truck, furniture, and tools. All of this was put into his business in an attempt to get his account with the defendant current.

On October 31, 1961, the bankrupt went out of business. At the trial, the bankrupt explained the reason for this: "We just weren't making it, period." The defendant was notified of the bankrupt's decision to go out of business about two weeks before. Thayer indicated that it would be all right for the defendant to go out of business.

On October 31, 1961, the bankrupt and Thayer took an inventory of the goods, merchandise and equipment in the filling station at that time. For each item on the inventory they agreed upon a valuation. This figure was arrived at by an examination of purchase receipts or by an approximation. The total figure arrived at was $2,336.48. On November 6, 1961, a credit in that amount was given to the bankrupt's account. Shortly thereafter, the defendant took the goods, merchandise, and equipment to another of its stations for storage.

At the trial, the bankrupt produced a list of his assets and liabilities as of October 31, 1961. He testified that this also reflected his financial position as of November 6, 1961. The list showed assets of $15,141.80 and liabilities of $33,-091.89. This list shows that the bankrupt was insolvent, as that term is defined in the Bankruptcy Act, at the time the transfer here in question was made.

A review of the credible evidence in this case compels a finding that the defendant knew or should have known that the bankrupt was insolvent at the time of the transfer. Since the bankrupt entered into the lease arrangement with the defendant, there had been a constant problem caused by the bankrupt being unable to keep his account current. The bankrupt had to borrow money to begin the operation and, on at least two occasions, had to borrow additional substantial amounts of money in unsuccessful

efforts to meet his obligations to the defendant. For a period of time before the bankrupt went out of business, he gave the defendant approximately thirty-five checks which were returned by the bank marked NSF. The defendant's president stated that they knew the bankrupt was having a difficult time, financially, in operating the station. He further testified as to his repeated efforts to collect his account from the bankrupt. He knew that the bankrupt had other creditors. The record is unclear as to how many other creditors Thayer knew of, but it does show that he knew of the two large loans the bankrupt received from his father-in-law and that the bankrupt refinanced his truck, furniture, and tools. The testimony of Thayer that he asked others if the bankrupt was meeting his obligations to them indicates that such an examination was, at best, a cursory one. Despite this history of the bankrupt's indebtedness to the defendant, the defendant did not make any effort to obtain a financial statement from the bankrupt.

■■ In a case such as this, a creditor-defendant who was clearly on notice that all was not well with the bankrupt's finances is chargeable with notice of all facts that a reasonably diligent inquiry would have disclosed concerning the bankrupt's financial status. Margolis v. Gem Factors, Corp., 201 F.2d 803 (2nd Cir. 1953). In this case, the record of the bankrupt's continued financial embarrassment, coupled with the return of approximately thirty-five checks marked NSF, constitutes clear notice to the defendant that the bankrupt was in serious financial difficulty. C. A. Swanson & Sons Poultry Co. v. Wylie, 237 F.2d 16 (9th Cir. 1956). The defendant is therefore chargeable with what knowledge a reasonably diligent inquiry would have revealed concerning the bankrupt's financial position. The Court can only conclude that such knowledge would have given the defendant reasonable cause to believe the bankrupt was insolvent at the time of the transfer involved in this action.

There is no credible evidence in the record of this case that the valuation placed on the goods, merchandise, and equipment in the inventory of October 31, 1961 was contingent upon the bankrupt agreeing to pay the entire amount of his indebtedness to the defendant. The inventory and the credit receipt given by the defendant to the bankrupt do not indicate any such contingency nor does any other credible evidence support such a claim.

In the course of the trial of this case, it came out that three items of equipment leased to the bankrupt by the defendant were mistakenly included in the inventory. These items and their agreed value were: one battery charger—$100.00; one timing light—$22.50; one 909 freezer detector—$8.95. Since title to these items was in the defendant, their value should not have been included in the inventory valuation and, consequently, the amount sought to be recovered by the trustee should be reduced to $2,205.-03.

The Court concludes that the transfer of November 6, 1961 constituted a preference under § 60 of the Bankruptcy Act and the trustee is entitled to recover from the defendant the sum of $2,205.03.

■ At the conclusion of the presentation of evidence in this case, the plaintiff moved to amend his pleadings to conform with the proof. The basis of this motion was that the evidence demonstrated that the transfer involved here was in violation of the Wisconsin Bulk Sales Act, § 241.18, Wis.Stats. (1963), which was in effect at the time of this transfer. The plaintiff's motion was granted since the trustee represents the interests of innocent creditors. At the time the motion was granted, the defendant was allowed an additional reasonable amount of time to prepare and present evidence to show compliance, if any, with § 241.18. More than eight months have elapsed since that time and the defendant has not availed itself of the opportunity to present further evidence. The only

evidence in the record of this case would indicate a failure to comply with § 241.18. Credible testimony shows that the defendant made no demand of the bankrupt for a written list of the bankrupt's creditors as required by § 241.18. The Court is of the opinion that the transfer in question here must be conclusively presumed to be fraudulent because of noncompliance with § 241.18, Wis.Stats. (1963).

The defendant has suggested that in the event the issues in this case are decided adversely to it, the defendant is entitled to a set-off under Section 68 of the Bankruptcy Act of the amount the bankrupt owed the defendant. No authority is cited in support of this proposition. Section 68 of the Bankruptcy Act is to apply "In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor * * *." The right of set-off must be measured as of the time when the bankruptcy petition was filed. See Desser, Rau & Hoffman v. Goggin, 240 F.2d 84 (9th Cir. 1957), cert. denied 355 U.S. 813, 78 S.Ct. 12, 2 L.Ed.2d 30. It is clear that at the time of the filing of the petition in bankruptcy by the bankrupt, there were not mutual debts and mutual credits between the bankrupt and the defendant. This case, therefore, does not fall within the provisions of Section 68 of the Bankruptcy Act.

The foregoing opinion constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52, Federal Rules of Civil Procedure.

The Clerk is directed to enter judgment in favor of the plaintiff and against the defendant in the amount of Two Thousand Two Hundred Five and 03/100 Dollars ($2,205.03). It does not appear that any demand was ever made on the defendant in this case and, under such circumstances, interest to the plaintiff should be allowed from the date of institution of suit—August 13, 1962. The plaintiff is also to have his costs and disbursements in this action.