EASTERBROOK, Circuit Judge.
The Boston & Maine Railroad entered bankruptcy proceedings in 1970. On the day of its bankruptcy it owed about $180,-000 to the Chicago, Rock Island, and Pacific Railroad for interline balances. (We use rounded numbers throughout, taking the figures agreed to after negotiation.).
Interline balances are the net amounts due from one railroad to another for mutual transactions. For example, one railroad may use another’s cars, and it must pay a daily rate. Railroads also collect revenues for multi-line movements, and they must remit portions to others for their parts of the transportation service. Under regulations of the Interstate Commerce Commission, each railroad computes every month how much it owes to each other railroad for these interline services. If at the end of January the Boston & Maine owed the Rock Island $50,000 for car fees and the Rock Island owed the Boston & Maine $47,-000, the difference of $3,000 would be an “interline balance” payable by the Boston & Maine on March 10.
The bankruptcy of the Boston & Maine interrupted its payment of past due interline balances. The Boston & Maine has paid new interline balances on a current basis, but the old balances remain outstanding. These make the Rock Island (now Chicago Pacific Corp.) a general creditor of the Boston & Maine. The First Circuit has considered and rejected a suggestion that the Boston & Maine be required to pay interline balances at a higher priority. In re Boston & Maine Corp., 600 F.2d 307 (1st Cir.1979). Under the Boston & Maine’s plan of reorganization, which has been confirmed by the district court in Boston, general unsecured creditors receive about 10 cents on the dollar.
The Rock Island joined the Boston & Maine in bankruptcy in 1975. The interline balances between 1970 and 1975 ran in favor of the Boston & Maine. The Rock Island tried to do what the Boston & Maine had done — to treat interline balances as unsecured debt of the bankrupt firm, to be paid some years hence. We held that the Rock Island could not do this but must immediately pay the entire pre-bankruptcy interline balances from per diem car charges and promptly remit all post-bankruptcy interline balances. In re Chicago, Rock Island & Pacific R.R., 537 F.2d 906 (7th Cir.1976), cert. denied, 429 U.S. 1092, 97 S.Ct. 1102, 51 L.Ed.2d 537 (1977). The Rock Island then paid the Boston & Maine *564 for most pre-bankruptcy balances, and it continued to pay until 1979. The district court in Chicago declared the Rock Island “cashless” in 1979 and permitted it to shut down its railroad business, owing the Boston & Maine about $100,000 for interline balances. This left the Boston & Maine as a creditor in the Rock Island bankruptcy, just as the Rock Island is a creditor in the Boston & Maine bankruptcy.
Although each railroad is a creditor in the other’s bankruptcy, there are two differences. First, the Rock Island has the assets to pay all claims fully, including interest, so although general unsecured creditors of the Boston & Maine get 10 cents on the dollar, the Rock Island pays such creditors more than 100 cents. Second, we held in 1976 that the Rock Island must pay even pre-bankruptcy interline balances immediately and fully, while the First Circuit held in 1979 that pre-bank-ruptcy interline balances are general unsecured claims. It expressly rejected, 600 F.2d at 310-12, our contrary conclusion. The upshot is that the Rock Island may collect $18,000 on a 15-year old debt of $180,000, while the Boston & Maine may collect more than $100,000 on a recent debt of $100,000.
The district court that supervises the Rock Island’s bankruptcy thought the difference inequitable. So when the Boston & Maine showed up to collect its debt after the confirmation of the Rock Island’s plan of reorganization, the district court sent it away empty handed. The court set off the two debts, leaving the Boston & Maine the net debtor. The district court recognized that debts may be set off in bankruptcy only if they are “mutual,” which means in part that each party owed money to the other on the date of bankruptcy; it also recognized that under Baker v. Gold Seal Liquors, Inc., 417 U.S. 467, 94 S.Ct. 2504, 41 L.Ed.2d 243 (1974), setoffs are not ordinarily allowed in railroad reorganizations. This case, the district court thought, is an occasion to lay these rules to the side. The court stated that the award of $18,000 to the Rock Island and more than $100,000 to the Boston & Maine is “fundamentally unfair. Therefore, while under ordinary circumstances B & M’s claims might be entitled to immediate payment, under the unique facts present here, equitable considerations require a different result.”
The Boston & Maine presses on us a number of arguments, including contentions that the district court’s decision to set off the debts was an effort to annul the Boston reorganization court’s decision limiting the payout to the Rock Island and therefore exceeded the Chicago court’s power. We need not consider whether the Chicago court has the power to do what it did, because we conclude that substantive principles of bankruptcy law do not permit a setoff. The apportionment of adjudicatory powers between two reorganization courts — a thorny issue indeed — will abide the time when it spells the difference in result. (The Chicago court had “jurisdiction,” because it was asked to dispose of a claim to assets of the Rock Island. We therefore may pretermit the issue without offending the principle that the court must resolve jurisdictional questions ahead of substantive ones.)
The initial, and we think dispositive, difficulty with the district court’s resolution is that the debts of the two firms are not “mutual.” Section 68(a) of the Bankruptcy Act of 1898, former 11 U.S.C. § 108(a), which applies to this case, provided that “[i]n all cases mutual debts and mutual credits between the estate of a bankrupt and the creditor shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid.”
The statute did not define “mutual.” Neither does its 1978 replacement, 11 U.S.C. § 553, which also makes setoff depend on mutuality of debt. Surprisingly few cases address the meaning of this term. But one feature of all definitions is that the debts on both sides must predate the bankruptcy — indeed must predate it by some time (four months under the old § 68(b) and 90 days under the new § 553(d)) to avoid being tagged a “preference” and thus avoided. See In re Verco *565 Industries, 704 F.2d 1134, 1139 (9th Cir.1983); In re Lehigh & Hudson River Ry., 468 F.2d 430 (2d Cir.1972); Prudential Insurance Co. v. Nelson, 101 F.2d 441 (6th Cir.), cert. denied, 308 U.S. 583, 60 S.Ct. 106, 84 L.Ed. 489 (1939); In re Dartmouth House Nursing Home, Inc., 24 B.R. 256 (D.Mass.1982); Ansfield v. Whitewater Oil Co., 254 F.Supp. 494 (E.D.Wisc.1966); In re Haffner, 25 B.R. 882, 888 (Bankr.N.D.Ind.1982). We could sustain the district court’s decision only by removing from the definition the requirement that the debts predate bankruptcy. We think, however, that the timing rule serves a substantial purpose.
A coi’porate reorganization is fundamentally a process of dividing assets among the firm’s creditors on the day of bankruptcy. The legal process prevents a rash of asset-grabbing and haggling that might prevent a viable business from continuing, and that surely would be an expensive fight. See Thomas H. Jackson, Bankruptcy, Non-Bankruptcy Entitlements, and the Creditors’ Bargain, 91 Yale L.J. 857 (1982); Douglas G. Baird, The Uneasy Case for Corporate Reorganizations, 15 J. Legal Studies 127 (1986). Bankruptcy draws a line between the existing claims to a firm’s assets and newly-arising claims. Existing claims are divided according to the contractual rights of the claimants. Butner v. United States, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). If there are not enough assets to go around, some claims may be written down or extinguished. The ongoing operations of the business are treated entirely differently; new claims are paid in full as they arise. It is as if the bankruptcy process creates two separate firms — the pre-bankruptcy firm that pays off old claims against pre-bankruptcy assets, and the post-bankruptcy firm that acts as a brand new venture.
A setoff of one pre-bankruptcy claim against another may be part of the process of adjusting creditors’ entitlements to the pre-bankruptcy assets. Setoffs are recognized in state law as contractual rights independent of bankruptcy. See In re Assured Fastner Products Corp., 773 F.2d 105 (7th Cir.1985). Self-help remedies often are limited by the bankruptcy code (the law ordinarily prevents secured creditors from realizing immediately on their collateral, for example), and setoff is one such self-help remedy that has been preserved in a restricted form. But the bankruptcy code does not authorize the extension of self-help remedies, on the part of pre-bank-ruptcy claimants, to reach post-bankruptcy assets. Butner held that a court should not construe bankruptcy law to enlarge private parties’ rights beyond those recognized in non-bankruptcy law.
The “mutuality” rule of old § 68 and new § 553 limits the extent of self-help and affords equal treatment to all who deal with the post-bankruptcy firm. There is no reason why some creditors of the pre-bank-ruptcy firm should have their rights diminished by post-bankruptcy transactions of the firm that might create setoffs — yet that would be the result of allowing pre- and post-bankruptcy debts to cancel each other out, because a setoff would reduce the cash intake of the firm, and therefore usually reduce the funds available to satisfy competing claims. There is also no good reason why the “new” Boston & Maine should receive cash from its trading partners that held no debt in “old” Boston & Maine, but nothing from trading partners that held such debt. The ability of traders to deal with “new” Boston & Maine without paying cash might jeopardize the prospects of a business that should succeed because it has a positive cash flow.
An example makes the point. Suppose a post-bankruptcy firm has monthly accounts receivable of $100,000 and monthly accounts payable of $95,000. For simplicity we assume that it has no other revenues or costs. This firm should survive, notwithstanding its prior bankruptcy. Bygones are bygones, and the future of this firm is profitable. Suppose, however, $10,000 of the receivables are owed by someone who was a creditor of the pre-bankruptcy firm. If the creditor can offset the new obligations against the old debt, the post-bankruptcy firm will fail. It cannot go on collecting $90,000 and paying $95,000 month *566 ly. The setoff produces the failure of a firm that should succeed. The creditor of the old firm who happens to do business with the new firm will get a higher payoff on old debt than does another creditor of the old firm who never owes a debt to the new one.
The district court recognized that one of the requirements of “mutuality” of debt is that both debts precede the bankruptcy. It thought, nonetheless, that considerations of equity overrode the law. But equity in the law is the consistent application of legal rules. The definition of in equity is unequal application of norms. Federated Department Stores v. Moitie, 452 U.S. 394, 401, 101 S.Ct. 2424, 2429, 69 L.Ed.2d 103 (1981). The bankruptcy law treats all pre-bankruptcy claims of the same class equally. When one claimant gets treatment that is denied to others, they have been treated inequitably.
The general creditors of the Boston & Maine get 10 cents on the dollar, while the district court gave the Rock Island more because of the happenstance that the Rock Island owed a debt to the Boston & Maine after 1970, while other creditors did not. Some railroads that dealt with the Boston & Maine throughout this period remained solvent. The Chessie System no doubt paid all interline balances as they came due. Under the district court’s decision the Ches-sie System will collect 10% of its account with the Boston & Maine, while the Boston & Maine has collected 100% of the Chessie System’s obligations to the Boston & Maine. Today the Rock Island and the Chessie System both are solvent, but the district court’s decision lets the Rock Island escape a post-1970 obligation that the Chessie System paid.
Under Butner the role of the bankruptcy court is to implement each party’s entitlements. Butner expressly rejected a doctrine, which this circuit had adopted, that allowed bankruptcy courts to alter entitlements in order to achieve more equitable treatment of creditors. 440 U.S. at 53-54, 99 S.Ct. at 917. And although we cannot say that a bankruptcy court has no discretion in dealing with claims of setoff — for Cumberland Glass Manufacturing Co. v. DeWitt & Co., 237 U.S. 447, 455, 35 S.Ct. 636, 639, 59 L.Ed. 1042 (1915), treated old § 68 as granting permission to recognize a setoff rather than compelling its recognition — we think the discretion runs one way only. Every setoff is a preference among creditors, see Gold Seal, supra. Sometimes the court may have compelling reasons not to allow that preference. But there is no justification for enlarging the preferential treatment beyond that provided by non-bankruptcy law or required by the bankruptcy code. The discretion to deny a setoff authorized by statute does not imply discretion to grant a setoff not authorized by statute. Any other approach replaces substantive law with the chancellor’s view of equity, which Butner held must not occur.
This leaves only the argument that there is something distinctive about railroad interline balances that requires the application of a different rule. The Rock Island correctly observes that all interline balances are “in the same right and between the same parties, standing in the same capacity,” which is another part of the definition of mutuality. See 4 Collier on Bankruptcy 553-22 (15th ed. 1979 & Supp. 1984). Interline balances are themselves setoffs; sums due from one line to another are set off, and only the balance is payable. The ICC requires the setoff to be done monthly, but there is nothing magical about a month. It could have chosen a longer accounting period, and if it had chosen a very long one (say, 20 years) the debts between railroads might be called contemporaneous. The fact remains, however, that the ICC chose one month as the accounting period, and the balances are supposed to be liquidated monthly. A bankruptcy court is not authorized to say that because the ICC could have chosen a longer and highly implausible period, these debts may be treated as if they were contemporaneous.
Of course this court held in 1976 that interline balances for per diem car charges *567 are different in still another way — they are so important to the functioning of the railroad system that even pre-bankruptcy balances must be paid immediately and in full. In 1979 the First Circuit took another position. In re Boston & Maine Corp., supra. The Rock Island forcefully argues that because it must pay the claims in full, the Boston & Maine must do so too, and the setoff is a step in that direction. The conflict between our decision and the First Circuit's does create an anomaly, but this does not cut entirely in the Rock Island’s favor. Our 1976 decision required the Rock Island to pay interline balances in full; it is only the Rock Island’s violation of that order that allowed it to become a debtor to the Boston & Maine to the tune of $100,000. Had the Rock Island paid as required, it would not now have the debt it seeks to set off.
At all events, we must respect the First Circuit’s disposition of claims in the Boston & Maine’s bankruptcy, just as that court surely will respect our disposition of claims in the Rock Island’s. Cf. Katchen v. Landy, 382 U.S. 323, 334-36, 86 S.Ct. 467, 475-76, 15 L.Ed.2d 391 (1966); Thompson v. Magnolia Petroleum Co., 309 U.S. 478, 483-84, 60 S.Ct. 628, 630-31, 84 L.Ed. 876 (1940). The First Circuit has held that pre-bankruptcy interline balances are general unsecured credit. This is consistent with provisions of the 1978 Bankruptcy Act, which set aside our 1976 decision for reorganizations filed after October 1, 1979. See In re Boston & Maine Corp., supra, 600 F.2d at 313. A district court ought not to try to bring about a different result for the Boston & Maine’s creditors just because it disagrees with the First Circuit’s holding. Some of the Boston & Maine’s creditors can be found in the First Circuit, others in the Third, which, like the First, treats interline balances as general unsecured debt. In re Penn Central Transportation Co., 486 F.2d 519, 528 (3d Cir.1973) (en banc), cert. denied, 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974); In re Penn Central Transportation Co., 553 F.2d 12 (3d Cir.1977). Still others are in circuits that have not taken a position. All should be treated equally in their role as claimants to the Boston & Maine’s assets, unaffected by the accident of geography that causes their “home courts” to apply different rules to claimants to their own assets. The Rock Island, as a bankrupt, is not treated unequally by the difference in the legal rules. The rules of bankruptcy law adjust claims by creditors to the bankrupt’s assets. Only by applying the First Circuit’s rule to all claims to the Boston & Maine’s assets can equal treatment among creditors be achieved. So to the extent the Rock Island argues for a setoff as a form of antidote to what it sees as a mistaken decision by the First Circuit, its argument fails. The debts are not mutual, and they may not be set off. The Boston & Maine’s claim must be honored.**
REVERSED.

The result would be the same if we were to overrule our 1976 case. In either event the First Circuit’s rule would be applied to this case (as it will be applied to all cases filed in the future, given Congress's action in 1978). Moreover, because the Rock Island has the assets to pay all pre-bankruptcy claims in full with interest, the Boston & Maine would have received 100 cents on the dollar had we decided our 1976 case the other way. There would be neither occasion nor authority for an equitable adjustment.