In re ST. FRANCIS PHYSICIAN NETWORK, INC., Debtors.

ST. FRANCIS PHYSICIAN NETWORK, INC., Plaintiff,

v.

RUSH PRUDENTIAL HMO, INC., Defendant.

Bankruptcy No. 96 B 31203.
Adversary No. 97 A 00103.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Oct. 10, 1997.

David Altman, Leonard Shifflet, Wilson & McIlvaine, Chicago, IL, for Rush Prudential HMO.

Mark Thomas, Paul Possinger, Katten, Muchin & Zavis, Chicago, IL, for Unsecured Creditors Committee.

Daniel Zazove, Barbara L. Yong, Barbakoff, Zazove & Glick, Chicago, IL, for Debtor.

### *AMENDED MEMORANDUM OPINION*

RONALD BARLIANT, Bankruptcy Judge.

### *INTRODUCTION*

This dispute arises out of a contract between the Debtor and a health maintenance organization, Rush Prudential HMO, Inc. ("Rush"). The contract required the Debtor to provide medical services to enrollees of the Rush HMO. The Debtor was required to pay the health care providers and in return Rush would pay the Debtor a monthly fee, known in the industry as a capitation fee. When the Debtor failed to pay the medical providers, Rush began withholding a portion of the capitation fees due the Debtor. This practice started pre-petition and continued after this bankruptcy case was filed.

Rush argues that pursuant to the contract, it is entitled to pay the health care providers directly and deduct such amounts from the capitation fees. Rush argues that this contractual right is consistent with theories of set off and recoupment. The parties have filed cross motions for summary judgment on these legal issues. For the reasons set forth below, this Court finds that, with a limited

exception, Rush has no right of set off and no right of recoupment.

## UNCONTESTED FACTS

The Debtor is an independent practice association of doctors that provides health care services under agreements with health maintenance organizations ("HMO") and insurance companies. The Debtor provided such services to Rush Prudential HMO, Inc. ("Rush") enrollees under a Medical Provider Agreement dated July 1, 1995. The Medical Provider Agreement requires 1) the Debtor to provide medical services to Rush enrollees, 2) the Debtor to pay the medical professional who provides the service, and 3) Rush to pay the Debtor a monthly "capitation" fee.

The Debtor arranged for the provision of services by its members. But in emergencies, services had to be provided by other medical professionals. There are, therefore, two classes of health service providers: network and "out-of-network." Network providers are those who had agreements with the Debtor, which, among other things, prohibited them from billing the patients directly, although many apparently breached that agreement. The out-of-network providers are those who had no agreement with the Debtor.

Rush had an obligation to its enrollees to provide them with services at no cost to them. The Medical Provider Agreement, in § 6.24, provided a mechanism by which Rush could protect its enrollees from claims:

> [The Debtor] agrees to pay all claims in a timely manner, but in no event later than 45 days after receipt of the bill. In the event that [the Debtor] fails to make payment within 45 days after receipt of a bill, [the Debtor] authorizes, but may not require, [Rush] to pay such claim on its behalf, and further authorizes [Rush] to deduct such payment from any amount due to [the Debtor].

Under that provision, Rush could pay bills "on [the Debtor's] behalf" even if Rush itself, or its enrollees, had no obligation to the provider. (That was the case with respect to network providers, who had agreed not to bill the patients.)

Beginning in September, 1996, the Debtor failed to pay some claims. The providers then billed the enrollees, who complained to Rush. Rush began withholding payment of the capitation fees and paying providers directly. From October, 1996 to April 15, 1997, (the bankruptcy was filed in November) Rush paid $74,557.40 to health care providers who had rendered services to Rush enrollees, and deducted that amount from capitation fees due the Debtor. All the payments (except a nominal sum) were for services rendered before the Debtor filed the petition commencing this bankruptcy case. But Rush deducted all but about $3,900 of those amounts from capitation fees earned after that filing.

The Debtor filed for chapter 11 relief on November 20, 1996. In December, Rush filed a motion to compel the Debtor to assume or reject the Medical Provider Agreement, and for relief from the automatic stay to set off amounts it paid health care providers from capitation fees due the Debtor and to terminate the agreement. This Court denied the requested relief, except that it modified the automatic stay to allow Rush to exercise an "at will" termination provision. Rush terminated the Medical Provider Agreement effective May 5, 1997.

The Debtor filed this adversary proceeding and a Motion for Temporary and Preliminary Injunctive Relief against Rush, requesting an order that Rush turn over all capitation fees due and refrain from withholding fees in the future. On February 14, 1997, this Court entered an order granting the Debtor's motion and requiring Rush to turn over capitation fees for October, 1996 through January, 1997. Rush was, however, permitted to withhold "up to $23,600 from the payment due pursuant to paragraph 1 of this Order, subject to Debtor's verification of enrollment and payment, pursuant to [Rush's] assertion that such amounts were paid to medical provider(s) prior to the hearing on Debtor's Motion." Rush made the required payment, less $17,029.58, which it had paid to health care providers for pre-petition services. Rush had made most of those payments ($13,129) post-petition, and the balance

($3,900) within 90 days before the filing of the bankruptcy petition.

After the February order, the Debtor continued to render medical care to Rush enrollees until the contract terminated in May, 1997. Rush withheld an additional $57,542.82 from the monthly capitation fees as follows: [1]

| MONTH | CAPITATION FEE DUE | AMOUNT WITHHELD |
|---|---|---|
| February | $30,535.87 | $18,520.87 |
| March | $27,578.52 | $19,797.50 |
| April | $27,035.07 | $19,224.45 |

Rush used the withheld funds to pay health care providers directly. With the exception of two payments totaling $69.30, all those payments were for services provided pre-petition.

## DISCUSSION

### Issues

The parties have filed cross motions for summary judgment concerning Rush's right to withhold a portion of the capitation fees due the Debtor to pay health care providers directly. Those motions bring into focus the competition between strong policies at the heart of this matter. Rush simply wants to enforce its contract as it is written. It argues that "the only real dispute can be whether [Rush] is entitled to exercise its contractual rights under the Agreement to pay providers and deduct such payments from capitation fees payable thereunder." Rush Reply Memorandum 2. It cites the holding in *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979), that "[p]roperty interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."

The Debtor, on the other hand, argues that federal interests, as reflected in the bankruptcy code, do require a different analysis. Equality of distribution to similarly situated creditors and debtor rehabilitation are bedrock bankruptcy policies. Here, the Debtor argues that Rush is using fees the Debtor earned after the petition was filed to pay claims that arose before that date. Some pre-petition creditors would be paid in full while others are not, and the Debtor would have less with which to finance its rehabilitation. From a bankruptcy perspective, that is as bad as it gets.

Rush's argument notwithstanding, it is settled law that a pre-bankruptcy contract is not enforceable *against* the debtor until it is assumed, but may be enforced *by* the debtor even before it is assumed. *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 532, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984); *In the Matter of Whitcomb & Keller Mortgage Co., Inc.*, 715 F.2d 375, 378 (7th Cir.1983); *In re S.N.A. Nut Company*, 191 B.R. 117, 120 (Bankr.N.D.Ill.1996). This proceeding, therefore, cannot be resolved simply by construing the contract, as Rush itself recognizes. Rather, these conflicting policies must be resolved by deciding two issues: 1) whether Rush has a right to set off under § 553[2]; and 2) whether Rush has an equitable right of recoupment. The facts related to these issues are not disputed and summary judgment is therefore appropriate. *LTV Steel Co. v. Northwest Engineering & Construction, Inc.*, 41 F.3d 332, 334 (7th Cir.1994).

### Set off

■ The Medical Provider Agreement gives Rush the right to set off its payments

---

**1.** Rush disputed some to the Debtor's numbers, but did not support its denial with evidence as required by Local Rule 402. The figures set forth in the Debtor's Statement of Uncontested Facts will therefore be deemed admitted. In some cases Rush "contest[ed] the materiality of the facts." That is not a proper response to a Statement of Uncontested Facts under Local Rule 402 and those facts to which Rush responded in this manner will also be deemed admitted.

In the Statement of Uncontested Facts filed by Rush in support of its cross motion for summary judgment there were a number of legal conclusions including, any "insufficiency" under § 553 (¶ 12 of Rush Statement); numerous legal interpretations of the Medical Provider Agreement (¶¶ 9, 11, 15, 17); whether certain acts arise under the same transaction (¶ 20); and whether claims were mutual (¶ 21). Legal conclusions should not be included in a Rule 402 statement and accordingly will not be deemed admitted. *Fisher v. Samuels*, 691 F.Supp. 63, 75, n. 2 (N.D.Ill.1988).

**2.** All statutory references are to the bankruptcy code, 11 U.S.C. § 101, et seq., unless otherwise indicated.

to providers from the capitation fees. But in bankruptcy, the right to set off is constrained by § 553.[3] "In general, section 553(a) recognizes and preserves rights of set off where four conditions exist: (1) the creditor holds a 'claim' against the debtor that arose before the commencement of the case; (2) the creditor owes a 'debt' to the debtor that also arose before the commencement of the case; (3) the claim and debt are 'mutual'; and (4) the claim and debt are each valid and enforceable." Collier on Bankruptcy, ¶ 553.01 (15th Ed. Revised).

For purposes of the set off analysis, Rush's claim has to be divided into two parts: (1) the portion of the $3,900 deducted from prepetition capitation fees used to pay out-of-network providers for pre-petition services, (2) the balance of the withheld amounts. Rush may set off the payments to out-of-network providers for pre-petition services, to the extent those payments were from prepetition capitation fees, but not the balance.

 Rush has no right of set off under § 553 with respect to the bulk of its claim for two reasons. First, the obligations were not mutual. Section 553 requires that the creditor and debtor have claims against each other in the same capacity. *In re Photo Mechanical Services, Inc.*, 179 B.R. 604, 613 (Bankr.Minn.1995). In this case there is a tripartite relationship. Rush owes the Debtor money, the Debtor owes the health care providers and Rush wants to pay the health care providers and deduct such amounts from the fees it owes the Debtor.

Rush relies on a case by the Fifth Circuit that allowed set off in a triparate relationship among a bank that serviced credit cards, a retail store (the debtor), and the store's customers who paid with credit cards. *In the*

*Matter of United Sciences of America*, 893 F.2d 720 (5th Cir.1990). But in that case the bank was obligated to the credit card issuers to pay any charge backs arising when customers rescinded transactions, and the retail store/debtor was obligated to indemnify the bank for those charge backs. So the bank and the debtor had mutual debts. Here, the Debtor owed debts to the health care providers, not to Rush. Rush had no obligation to pay the network providers and therefore the Debtor had no duty to indemnify Rush.[4] Rather, Rush had the *option* to pay the providers "on [the Debtor's] behalf" and then reimburse itself. So the Debtor never owed any debt to Rush, but authorized Rush to use the capitation fees to pay the Debtor's creditors.

It is true that under ¶ 6.24 the Debtor owed a duty to Rush to pay the providers' bills. But because Rush was not liable for those bills from network providers, the breach of that duty did not damage Rush in a sense cognizable under state law, and therefore did not give rise to a claim. Rather, it had the right to use money otherwise payable to the Debtor to pay those debts owed by the Debtor. This was an effective way Rush could resolve the business problem created when its enrollees received improper bills. But § 553 requires more.

 Even assuming the Debtor owed a debt to Rush, there is a second reason that set off cannot be allowed under § 553: The Debtor incurred its obligation to the providers before the commencement of the case (when they provided the services), but, except $3,900, Rush incurred its debt to the Debtor after the commencement of the case when the Debtor earned the capitation fees

**3.** § 553(a) provides, in relevant part: "Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case...."

**4.** Rush is cagey about this issue, but it is clear that part of the arrangement was that network providers were referred patients on the understanding that the providers would look to the

Debtor for payment, not the patients. If the patients were not liable to the providers for the services they received, then there was no liability Rush was obligated to indemnify. The same may not have been true of out-of-network providers. But there is no breakdown of the amount of payments to such entities, and it was likely not a large percentage of the total. In any event, there is a second ground for denying set off that is applicable to all the payments, including those to out-of-network providers for post-petition services.

at issue. Section 553 allows a set off only if both obligations arose pre-petition.[5] *Boston and Maine Corporation v. Chicago Pacific Corporation,* 785 F.2d 562, 564 (7th Cir. 1986).

■ With respect to the portion of the $3,900 Rush both withheld from pre-petition fees *and* used to pay out-of-network providers for pre-petition services, the result is different. Since the out-of-network providers had not agreed to look solely to the Debtor for their compensation, they had enforceable claims against the Rush enrollees, and Rush therefore had an obligation to indemnify the enrollees against those claims. As a result, Rush did have a claim against the Debtor to that extent. That claim and its debt for the $3,900 portion of the capitation fees both arose pre-petition.

The Debtor does argue that set off is nonetheless prohibited by § 553(a)(2), which bars set off of claims transferred to the creditor within 90 days before bankruptcy. But these claims were not transferred to Rush. Rush had an obligation to pay the providers, and a right under ¶ 6.24 to deduct the amount of those payments. Therefore, Rush had its own claim, in its own right, like the bank in *United Sciences.*[6]

Although Rush has a right of set off with respect to some amount, it is impossible to say exactly what that amount is. The record does not reflect what portion of the $3,900 withheld from capitation fees earned pre-petition was applied to the claims of out-of-network providers for pre-petition services. The parties will be required to supplement the record so that a final judgment can be entered.

*Recoupment*

■ Recoupment is the doctrine that courts often turn to when trying to resolve the conflict between the law of contracts and bankruptcy law. It is easy enough to state the general principles. The key difference between recoupment and set off is that a set off may (although it does not necessarily) involve different transactions, but the essential element of recoupment is that it is a demand arising from the same transaction as the debtor's claim. *In re Peterson Distributing, Inc.,* 82 F.3d 956 (10th Cir.1996). Recoupment is not mentioned in the bankruptcy code, but "is an equitable doctrine which is based on the premise that 'the defendant should be entitled to show that because of matters arising out of the transaction sued on, he or she is not liable in full for the plaintiff's claims.'" *Id.* at 959, *quoting,* Collier ¶ 553.03. "The justification for the recoupment doctrine is that where the creditor's claim against the debtor arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's claim against the creditor rather than a mutual obligation, and application of the limitations on set-off in bankruptcy would be inequitable." *In re Klingberg Schools,* 68 B.R. 173, 178 (N.D.Ill.1986).

*Conflict Between Recoupment and the Bankruptcy Code.*

The difficulty with recoupment is that it leads to results inconsistent with the bankruptcy code and fundamental bankruptcy policies, including the following:

*§ 365 and executory contracts:* As noted above, it is settled that a pre-petition contract is not enforceable against a debtor in possession until it is assumed under § 365,

---

**5.** In its cross motion for summary judgment, Rush argues that set offs are allowed in the 90 days preceding the bankruptcy if the set off does not reduce the "insufficiency." § 553(b). That argument is irrelevant to the issue raised here. Section 553(b) authorizes the avoidance of certain set offs made pre-petition. The Debtor is not seeking to avoid pre-petition set offs; it is arguing that Rush had no right of set off in the first place.

**6.** The Debtor also argues that ¶ 6.24 cannot be enforced because the contract was terminated.

That argument is rejected. The Medical Provider Agreement remained in effect until May 5, 1997, and governs the period in question. Its termination that day did not abrogate any rights that were created before that day. Moreover, the cases cited by the Debtor on this issue are not dispositive, and one of those cases, *Consumer Health Services Of America, Inc.,* 171 B.R. 917 (Bankr.D.D.C.1994) was reversed on appeal, and recoupment was permitted. *U.S. v. Consumer Health Services of America Inc.,* 108 F.3d 390 (D.C.Cir.1997).

even though it is enforceable by the debtor in possession. The policy of allowing debtors in possession time to decide whether to assume contracts, while they continue to operate their businesses (as allowed under § 1108), would be undermined if the debtor had to cure pre-petition defaults to obtain post-petition performance from the non-debtor. See, *Bildisco; Whitcomb & Keller; In re University Medical Center,* 973 F.2d 1065, 1075 (3rd Cir.1992). Indeed, *Whitcomb & Keller* holds that requiring the non-debtor to perform a contract post-petition did not amount to its assumption, so the debtor was not required to cure the pre-petition default. *University Medical Center* is in accord. But to allow a pre-petition breach to be cured by recoupment would amount to the same thing. 1 David G. Epstein, et al, § 5–25, at 492 (1992) ("[T]he nondebtor party should not be able to exercise its right of recoupment to reduce its postpetition obligations under an executory contract by the debtor's prepetition defaults under the contract. To permit recoupment would be inconsistent with section 365(b) as it would effectively result in a cure of prepetition defaults even though there has been no assumption decision by the debtor.")

*§§ 549, 553 and post-petition transfers:* Section 549 prohibits the unauthorized transfer of estate assets. It codifies important policies of treating pre-petition claims equally, while allowing the debtor in possession to operate by incurring and paying new debts, as authorized by § 363(c) (authorizing use of property of the estate in ordinary course of business). Section 553's requirement that the offsetting claim and debt both arose pre-petition serves the same functions. "Bankruptcy draws a line between the existing claims to a firm's assets and newly arising claims.... It is as if the bankruptcy process creates two separate firms—the pre-bankruptcy firm that pays off old claims against pre-bankruptcy assets, and the post-bankruptcy firm that acts as a brand new

venture.... [T]he bankruptcy code does not authorize the extension of self-help remedies [e.g., set off], on the part of pre-bankruptcy claimants, to reach post-bankruptcy assets." *Boston and Maine Corporation,* 785 F.2d at 565 (reversing allowance of "equitable" set off of pre- and post-petition obligations). The Seventh Circuit went on to explain the reason for this restriction on rights created by state law:

> The 'mutuality' rule of ... § 553 limits the extent of self-help and affords equal treatment to all who deal with the post-bankruptcy firm. There is no reason why some creditors of the pre-bankruptcy firm should have their rights diminished by post-bankruptcy transactions of the firm that might create setoffs—yet that would be the result of allowing pre- and post-bankruptcy debts to cancel each other out, because a set off would reduce the cash intake of the firm, and therefore usually reduce the funds available to satisfy competing claims. *Id.*

The Debtor's post-petition earnings were property of the estate.[7] § 541(a)(6),(7). They were earned by the Debtor's post-petition labors and use of estate assets. The Debtor could use those earnings to pay bills incurred in the post-petition operation of its business and to fund a plan to pay all similar creditors equally, not to pay a selected group of pre-petition creditors more than others. Recoupment has the same effect as the transfer of post-petition earnings to pay pre-petition claims. And it is virtually identical to the "equitable" set off of pre- and post-bankruptcy debts condemned in *Boston and Maine Corporation.*

*§§ 507, 547, 726, 1129(a)(7) and priorities and equality of distribution:* No policy is more important in bankruptcy than equality of treatment among creditors of equal status. The bankruptcy code establishes an order of priorities and requires distribution of estate

---

**7.** Rush argues that the capitation fees were not estate assets until paid because § 8.1 of the Medical Provider Agreement says that compliance with ¶ 6.24 is a condition to *payment* of the capitation fees. But a debtor or an estate acquires an interest in property when it is *earned,* not when it is payable. See, § 541(a). Paragraph 6.24 is a condition to the payment, not the

earning, of the fees. In fact, the provision assumes there is already an "amount due" the Debtor from which Rush can deduct any claims it pays. Therefore, the right to those fees was property of the estate at the time Rush withheld funds from them. Indeed, if it were otherwise, it is hard to see how they could have been used to pay the Debtor's debts "on its behalf."

assets according to that order. §§ 726(a),507(a). That policy is enforced in chapter 11 by the requirement that dissenting creditors receive at least as much as they would under chapter 7. § 1129(a)(7). The policy is so strong that even lawful payments and other transfers to creditors by the pre-bankruptcy debtor may be recovered as preferences. § 547. The Supreme Court recently held that the Congressionally created distribution priorities could not be categorically altered for equitable reasons. *United States v. Noland,* —— U.S. ——, ——, 116 S.Ct. 1524, 1525, 134 L.Ed.2d 748 (1996). Yet the equitable doctrine of recoupment allows non-debtor parties to contracts with debtors to recover a greater percentage of what would otherwise be unsecured pre-petition claims than they would recover without recoupment. That may be viewed as a categorical alteration of priorities. At a minimum, it favors, or prefers, some creditors over others for reasons not codified in the priorities provisions of the bankruptcy code.

### The Same Transaction Requirement as a Means of Reconciling the Conflict

 The circuit courts have generally recognized the potential inconsistency between recoupment and bankruptcy policies and have attempted to resolve the issue by focusing on the "same transaction" requirement for recoupment as a means of limiting the reach of the doctrine. "[F]or the purpose of recoupment, 'same transaction' must be narrowly defined." *Peterson Distributing, 82 F.3d* at 960. The Tenth Circuit in *Peterson Distributing* went on to explain:

> Although not included in the Uniform Commercial Code or the Bankruptcy Code, recoupment functions like a security interest, in that it grants priority to a creditor's claim in the bankruptcy estate in so far as the estate has a claim against the creditor arising from the "same transaction" as the creditor's claim. The "same transaction" requirement acts as a mechanism to ensure that equitable reasons for recoupment are present before a creditor may attain priority through the doctrine of recoupment. *Id.*

*Peterson Distributing* then rejected the argument that claims arising from the same contract also arise from the "same transaction." "A 'same contract equals same transaction' rule would be overly simplistic. Instead, . . . the 'same transaction' analysis involves an examination of the parties' equities." 82 F.3d at 960. Following the Third Circuit's decision in *In re University Medical Center,* 973 F.2d 1065 (3rd Cir.1992), the *Peterson Distributing* court held that "the doctrine is only applicable to claims that are so closely intertwined that allowing the debtor to escape its obligation would be inequitable notwithstanding the Bankruptcy Code's tenet that all unsecured creditors share equally in the debtor's estate." *Id.*

In *Peterson Distributing,* the debtor and Conoco were parties to a single, integrated contract. Under that contract, the debtor bought goods from Conoco on credit, and accepted credit card payments for retail sales, for which Conoco was to pay the debtor. The debtor owed Conoco for pre-petition purchases, and continued to accept credit cards post-petition. When the debtor sought payment for the credit card transactions, Conoco claimed a right of recoupment. Applying its narrow definition, the court held that the two claims did not arise from the same transaction, even though they arose from the same contract.

In *University Medical Center,* the debtor was a medicare provider who had received overpayments for 1985. It rendered post-petition services in 1988, but the government asserted a right to recoup its 1985 overpayments from what it owed for the 1988 services. The government argued "that the same 'broad and flexible standard' employed to determine the scope of compulsory counterclaims" should apply to recoupment claims. 973 F.2d at 1081. The court rejected that "openended standard" in favor of the "stricter" "single integrated transaction" standard. It then held that the 1985 overpayments did not arise from the "same transaction" as the 1988 services because "[t]he 1988 payments were independently determinable and were due for services completely distinct from those reimbursed through the

1985 payments." *Id.*[8]

*Application of the Recoupment Doctrine.*

The Seventh Circuit has not spoken to this issue. But it has made abundantly clear the limited scope of the equitable powers of bankruptcy courts. See, *In the Matter of Fesco Plastics Corporation, Inc.,* 996 F.2d 152, 157 (7th Cir.1993) ("[A] bankruptcy court is simply not authorized to do whatever is necessary to reach an equitable result; it may only do whatever is necessary to enforce the Code...."); *In the Matter of Lapiana,* 909 F.2d 221, 223–24 (7th Cir.1990) ("[B]ankruptcy, despite its equity pedigree, is a procedure for enforcing pre-bankruptcy entitlements under specified terms and conditions rather than a flight of redistributive fancy.... We deprecate flaccid invocations of 'equity' in bankruptcy proceedings."). Of particular relevance is *Boston & Maine Corp.,* holding that the lower court had no equitable power to enlarge the creditor's set-off rights beyond that allowed by the bankruptcy law. "[The district court] thought ... that considerations of equity overrode the law. But equity in the law is the consistent application of legal rules. The definition of inequity is unequal application of norms. (Citations omitted.) The bankruptcy law treats all pre-bankruptcy claims of the same class equally. When one claimant gets treatment that is denied to others, they have been treated inequitably." 785 F.2d at 565.

Recoupment being an equitable doctrine, it may, therefore, be allowed only when it will not distort the application of legal rules. Overpayment cases may fall within that category. See, *In re Photo Mechanical*

*Services, Inc., 179 B.R. 604,* 613 (Bankr. D.Minn.1995); *In re Sluss,* 107 B.R. 599, 602 (Bankr.E.D.Tenn.1989). A creditor may pay an advance against the price of the debtor's performance, or pay too much for a pre-petition part of that performance. If the debtor seeks to enforce the contract post-petition by performing and demanding payment, allowing recoupment as a defense should not unduly disturb bankruptcy rules of distribution. It is true that the creditor would have only a pre-petition claim if the debtor did not choose to perform. But the bankruptcy debtor's right to enforce the contract is limited by the duty to afford fair consideration. *Bildisco,* 465 U.S. at 531, 104 S.Ct. at 1199. The Seventh Circuit's strictures against "flaccid invocations of equity" do not prohibit recognition of traditional equitable defenses, such as recoupment, within their appropriate limits. *Lapiana,* 909 F.2d at 224. While the creditor is better off than it would have been had the debtor rejected the contract, that is only because the debtor decided that the cost of post-petition performance was worth the gain to the estate. Recoupment in that context becomes a mechanism for determining the fair price for the debtor's performance.

Satisfaction of the "same transaction" test, therefore, requires that there be such a close, necessary relationship between the events that gave rise to the debtor's post-petition claim and the events that gave rise to the creditor's pre-petition claim that the amount of the former cannot fairly be determined without accounting for the latter. That test cannot be satisfied merely by show-

8. Contra, *U.S. v. Consumer Health Services of America Inc.,* 108 F.3d 390 (D.C.Cir.1997), which reached a different result without rejecting the Third Circuit's standard. Rather, the D.C. Circuit held, first, that the Medicare statute dictated the result, and, second, under the regulations and statute the overpayments and post-petition services were part of the same integrated transaction. "Even under the Third Circuit's stricter standard, we believe that Consumer's claim for post-petition services and the pre-petition overpayments qualify. Unlike the Third Circuit, we do not think the frequency of the audit appropriately defines the 'transaction.'.... It is the statute and regulations which dictate the effect of the audit on the provider's participation in Medicare." *Id.* at 395. So the DC Circuit "conceptu-

alized" the transaction differently, leading to the different result under the same standard.

The narrow standard has not been followed by all circuits. The Ninth Circuit applied a "logical relationship" test similar to that applied to compulsory counterclaim issues, explicitly rejecting the "more narrow definition of the phrase 'same transaction'" applied in *University Medical Center. Newbery Corp. v. Fireman's Fund Ins. Co.,* 95 F.3d 1392, 1403 (9th Cir.1996). The court did, however, agree with *University Medical Center* "that courts should apply the recoupment doctrine in bankruptcy cases only when 'it would ... be inequitable for the debtor to enjoy the benefits of the transaction without meeting its obligations.'" *Id.*

ing that the two claims arose under the same contract and that contract allowed set off. When the two claims arise from different parts of a contract, dealing with different performance obligations, recoupment comes closer to a prohibited cure of pre-petition defaults with post-petition assets, or a prohibited set-off of a pre-bankruptcy claim against a post-bankruptcy debt, at the expense of other creditors. It also rewards the recouping creditor for being lucky enough to have had an uncompleted contract at the date of bankruptcy.[9] In *Peterson Distributing*, for example, the debtor's claim for post-petition acceptance of credit cards could be fully and fairly compensated without reference to the creditor's pre-petition sale of goods to the debtor. To have allowed recoupment would have been inequitable to other creditors because the estate would have received less for the debtor's post-petition performance than the fair price of that performance, with the difference being a windfall to Conoco.

■ Applying the narrow construction of the "same transaction" standard that this Court believes is required, Rush cannot be allowed to recoup its pre-petition claim against its post-petition debt. Rush's claim arises from its exercise of a right to pay providers on the Debtor's behalf and deduct

that amount from capitation fees. Rush's post-petition debt is for capitation fees due for services rendered to Rush enrolles after the date of bankruptcy. Those fees are calculated according to the terms of the Agreement, without reference to whether the Debtor paid providers for prior services. In other words, the price for the Debtor's post-petition performance may be (and was) calculated independent of ¶ 6.24.[10] Moreover, although that provision authorizes Rush to pay the health care providers directly and deduct such amounts from the capitation fees, the Agreement does not govern the relationship between the Debtor and the health care providers. In fact, the claims of the health care providers arise from separate agreements with the Debtor, and were for services unrelated to the services that gave rise to the capitation fees.[11] Rush's claim to a right of recoupment is therefore even weaker than those asserted in *Peterson Distributing* and *University Medical Center*.

### Effect of February 14th Order

■ This Court's order of February 14, 1997, allowed Rush to withhold up to $23,600 from the capitation fees due for October, 1996 through January, 1997. The parties now dispute the meaning and effect of that provision. It has no effect on the final out-

---

9. One of the under-discussed issues in recoupment cases is why a creditor with a partially unperformed contract is entitled to better treatment than creditors who fully performed their contracts before bankruptcy or whose contracts are rejected. From the creditor's perspective, the date of bankruptcy is a fortuity. But the broad view of recoupment adopted by the Ninth Circuit (the logical relationship test) would treat creditors differently solely because that date falls at a particular point in the life of the contract rather than at a later point. A creditor who becomes indebted to the estate post-petition has a potential source of payment that creditors whose contracts were completed (except the debtor's payment) before bankruptcy do not have. When the equity focus includes other creditors (as it must in a bankruptcy case), there is little that recommends treating creditors differently solely because of that fortuity.

10. It is true that ¶ 8.1 says that payment is conditioned upon compliance with Article VI, i.e. ¶ 6.24. But that provision simply reinforces the contractual right to set off. It does not make the calculation of the capitation fees dependent on

anything in ¶ 6.24. The contract, of course, cannot create a right of recoupment where none would otherwise exist, any more than it could change bankruptcy distribution priorities or negate the preference provisions of the bankruptcy code. To hold otherwise would be to adopt the "single contract equals single transaction" rule rejected by *Peterson Distributing*.

11. Indeed, the tripartite relationship among Rush, the Debtor and the providers, based on separate agreements, leads to a plausible scenario that highlights the differentiation between the events that led to the two claims. Although, the parties have not discussed the problem, if Rush paid the Debtor's debts to the providers with funds that otherwise would have been payable to the Debtor, it is hard to see why the providers would not be liable to the estate for having received avoidable preferences or unauthorized post-petition transfers. In other words, if Rush were allowed to recoup the payments it made to the providers, the providers themselves might be required to return those payments to the estate. That result would not be possible if there were only one transaction.

come of this proceeding for two reasons. First, it was an interlocutory order, subject to revision at any time. See, F.R.Civ.P 54(b). Second, the purpose of the order was to preserve the status quo until a final resolution of the issues. At the hearing that led to that order, this Court held that the terms of the contract itself permitted Rush to withhold capitation fees only to the extent it had already paid provider claims; it did not permit Rush to withhold fees to secure itself against the prospect of future provider claims. Given the Court's interpretation of the contract, the parties agreed to the provision now in dispute to deal with payments that had, in fact, been made from the withheld fees. The balance of the fees were ordered paid to the Debtor, as the contract (in this Court's view) required.

The only effect of the February 14th order, therefore, was to preserve the *status quo* by requiring the parties to comply with the contract until their rights and liabilities could be resolved by a final order. Nothing in that order prejudiced Rush. It was only allowed to deduct the amount it had already paid to providers from the capitation fees it was then holding. The later payments it made and then withheld from capitation fees due after the February 14th order could not have been made in reliance on that order. That order does not have any bearing on the final outcome of this proceeding.

## CONCLUSION

With the exception of payments to health care providers for pre-petition services which were deducted from capitation fees earned by the Debtor pre-petition, Rush has no right of set off. (It is clear from the record that this limited set off will not exceed $3900). This is because there is no mutuality of obligation and both obligations did not arise pre-petition. This Court also finds that Rush has no right of recoupment because the claims arise from different transactions.

This Court will allow Rush to file a supplemental exhibit substantiating its set off claim within the limits set forth in this opinion. A final judgment will then be entered requiring Rush to turn over all capitation fees, including the amounts withheld pursuant to the

February 14, 1997 order, less the permitted set off.