**In re DOCTORS HOSPITAL OF HYDE PARK, INC., Debtor.**

No. 00 B 11520.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Jan. 25, 2002.

James E. Ryan, IL Attorney General, James D. Newbold, Chicago, IL, for Movant or Plaintiff.

Ronald R. Peterson/Jenner & Block, Chicago, IL, (Representing Dr. James Desnick), Sheldon L. Solow/Kaye Scholer, LLP, (Representing Daiwa Special Asset Corp.), John W. Costello, James E. Morgan/Wildman, Harrold, Allen & Dixon, Chicago, IL, (Representing Debtor), for Respondent or Defendant.

## MEMORANDUM OPINION

CAROL A. DOYLE, Bankruptcy Judge.

This matter is before the court on the State of Illinois Department of Public Aid's ("IDPA") Combined Motion for Order Determining that IDPA has a Right to Recoup Amounts Owed by Debtor from Amounts Due Debtor, or in the Alternative, to Lift Stay to Allow Setoff, and Motion of the State of Illinois Departments of Revenue ("IDR") and Employment Security ("IDES") to Lift Stay to Allow Setoff ("Combined Motion"). IDPA, IDR and IDES (collectively, the "State") claim that they are entitled to recoupment from the debtor Doctors Hospital of Hyde Park, Inc. ("debtor") for Medicaid overpayments and unpaid taxes. In the alternative, they argue that they are entitled to set off those amounts. The debtor, Dr. James Desnick and Daiwa Special Asset Corporation ("Daiwa"), an assignee of the debtor's accounts receivable, argue that the State does not have the right of recoupment or setoff against Medicaid reimbursement payments owed to the debtor. Daiwa further argues that to the extent the State does have a right of setoff, Daiwa's perfected security interest has priority over that right.

The court concludes as follows: (1) the State is not entitled to recoupment for the various taxes owed by the debtor; (2) the court needs additional information to determine whether recoupment of Medicaid overpayments is permissible; (3) the State meets the requirements for setoff, and may set off the Medicaid overpayments owed by the debtor; and (4) Daiwa's alleged perfected security interest in the debtor's accounts receivable is superior to the State's setoff rights arising from unpaid taxes to the extent that the State's claim for those taxes accrued after it received notice of Daiwa's interest in July 1997.

## I. Factual Background

The debtor operated hospital and long term care units, both of which were licensed with IDPA as Medicaid providers pursuant to an Agreement for Participation in the Illinois Medical Assistance Program Agreement ("Participation Agreement") and an IDPA Long Term Provider Agreement ("Long Term Agreement") (collectively, the "Agreements"). On April 17, 2000, the debtor filed a Chapter 11 bankruptcy petition. As of the petition date, IDPA alleges that the debtor owed it $298,652.00 in taxes and penalties for the debtor's operation of the hospital unit under 305 ILCS 5/5A–2 and 305 ILCS

5/5A–4 ("hospital tax"), and $12,360.00 in taxes and penalties for the long term care unit under 305 ILCS 5/5E–10 and 305 ILCS 5/5B–5(g) ("bed tax"). IDPA also alleges that it is owed $1,701.19 in overpayments of Medicaid reimbursements. In total, IDPA is claiming $312,713.19.

The debtor was also subject to the Retailers' Occupation and Use Tax Acts and the Illinois Income Tax Act, administered by IDR, and the Unemployment Insurance Act, administered by IDES. IDR has filed a claim for retailers' occupation and use taxes totaling $73,438.56 and income taxes totaling $42.95. IDES has filed a claim for prepetition unemployment taxes totaling $140,930.11 and postpetition unemployment taxes totaling $37,832.13.

IDPA owes the debtor for providing services reimbursable under the Medicaid program. IDPA has placed an administrative freeze on those reimbursement payments pending a final determination on its Combined Motion. The payments total approximately $180,624.14 for prepetition services and up to $1,855.41 for postpetition services.

Daiwa claims that it holds a perfected security interest in the debtor's healthcare receivables, including the Medicaid receivables that IDPA owed the debtor. Daiwa further alleges that its predecessor, Daiwa Healthco–2, entered into a financing transaction with the debtor and its affiliate, MMA Funding, LLC ("Funding"). Pursuant to the agreement between Funding and the debtor, Funding assigned its rights to healthcare receivables, including Medicaid payments, to Daiwa Healthco–2 as collateral for a revolving loan. On March 31, 1997, Daiwa Healthco–2 perfected its interest by filing a financing statement. Funds from the revolving loan were provided to the debtor to use in its operations. On July 1, 1997, Daiwa sent a letter to the Office of the State Comptroller ("Comptroller") notifying the State of the assignment of the debtor's accounts receivable to Daiwa.

## II. Issues

The parties have raised the following issues:

1. Does the State have a right of recoupment?

2. Does the State have a right of setoff?

3. If so, is Daiwa's perfected security interest superior to the State's right of setoff?

## III. Recoupment

First, the State asserts that it is entitled to keep the Medicaid payments it owes the debtor under the doctrine of recoupment. The right of recoupment arises where there is a right to offset mutual amounts due under the same contract. A party seeking recoupment must show (1) that the obligations arose out of the same contract and (2) that they involved the same transaction. *St. Francis Physician Network, Inc. v. Rush Prudential HMO, Inc. (In re St. Francis Physician Network, Inc.)*, 213 B.R. 710, 719–20 (Bankr.N.D.Ill.1997) (Barliant, J.). Courts have generally applied one of two tests to determine whether mutual obligations arose from the same transaction. Under the "logical relationship" test, courts look at whether a series of occurrences is "logically related" so as to qualify as a single transaction. *See Sims v. Dep't of Health & Human Servs.*, 224 F.3d 1008, 1012 (9th Cir.2000). Other courts have applied the "integrated transaction" test, which requires "such a close, necessary relationship" between the debtor's and creditor's claims that the debtor's claim "cannot fairly be determined without accounting for" the creditor's claim. *St. Francis*, 213 B.R.

at 719; *see In re Univ. Med. Ctr.*, 973 F.2d 1065 (3rd Cir.1992).

The Seventh Circuit has not expressly adopted a test for recoupment. However, this court agrees with the court in *St. Francis* that the "integrated transaction" test should be applied. The Bankruptcy Code does not specifically provide for recoupment, and the Seventh Circuit has made clear that bankruptcy courts should not broadly apply "equitable" concepts in contravention of the Code. *E.g., In re Fesco Plastics Corp.*, 996 F.2d 152, 157 (7th Cir.1993); *In re Lapiana*, 909 F.2d 221, 223–24 (7th Cir.1990). This doctrine should be construed narrowly to prevent a distortion of the Code's rules for distribution to creditors. *See St. Francis*, 213 B.R. at 719.

The court is not persuaded by the State's argument that recoupment is permissible whenever the party seeking it could have filed a compulsory counterclaim under common law. The State relies on *Coplay Cement Co. v. Willis & Paul Group*, 983 F.2d 1435, 1440 (7th Cir.1993), to argue that recoupment is the "ancestor" of the compulsory counterclaim governed by Rule 13(a) of the Federal Rules of Civil Procedure, and that the "logical relationship" test applied for compulsory counterclaims should apply to recoupment. However, the *Coplay* decision did not address recoupment in a bankruptcy context. Instead, it discussed in dicta the evolution of the compulsory and permissive counterclaim rules in the Federal Rules of Civil Procedure in a nonbankruptcy contract case. Regardless of Rule 13's ancestry, the test for a procedural rule applicable in all federal civil proceedings should not determine the substantive test to be applied for an equitable doctrine not recognized by the Bankruptcy Code.

## A. Taxes

The State asserts that it is entitled to recoupment for the two types of taxes the debtor owes IDPA: the hospital tax and the bed tax. The hospital tax is imposed on all hospitals operating in Illinois "for the privilege of engaging in the occupation of hospital provider." 305 ILCS 5/5A–2 (West 1993). It is based on a percentage of the provider's adjusted gross revenue. The bed tax is imposed on all nursing homes and is based on the number of licensed nursing bed days. 305 ILCS 5/5E–10. The State asserts that the Agreements require the debtor to comply with applicable Illinois law, and that therefore the obligation to pay these taxes is logically connected to the State's obligation to make Medicaid reimbursements. In addition, the State contends that the hospital tax is related to the Medicaid reimbursement transactions under the Agreements because its purpose in part is to allow IDPA to get additional Medicaid funding from the federal government, which will benefit the hospitals seeking Medicaid reimbursement.

The court finds that the obligation to pay these taxes does not arise from the same transaction as the obligation of the State to make Medicaid reimbursements. The tax obligations are owed under separate statutes that have no connection to the transactions for which the State owes the debtor reimbursement. The amount the State owes the debtor can be determined completely independently of the amount of taxes owed. Those taxes are calculated on the basis of the hospital's gross revenue and the number of nursing bed days for each facility, which have nothing to do with how much the State should pay the debtor for Medicaid services. The State therefore clearly does not meet the "integrated transaction" test for the "same

transaction" element of a recoupment claim.

The State cites *United States v. Consumer Health Services of America, Inc.*, 108 F.3d 390 (D.C.Cir.1997), for the proposition that different types of claims arising under a comprehensive statutory scheme can meet the "integrated transaction" test. It argues that the Illinois Public Aid Code envisions the netting of hospital taxes against outstanding Medicaid reimbursements, creating a comprehensive scheme that makes the obligation to pay taxes part of the same transaction that gave rise to the State's obligation to make Medicaid reimbursement. *See* 305 ILCS 5/5A–7(b) (West 1993). In fact, however, the court in *Consumer Health Services* simply held that Medicare overpayments, not tax debts, were part of the same transaction based on specific language regarding adjustment for overpayments in the payment provision of the Medicare statute. *See Consumer Health Servs. of America, Inc.*, 108 F.3d at 394. The State has cited no authority for the proposition that Medicaid reimbursements and tax debts are part of the same transaction for recoupment purposes. The State's statutory right to setoff does not make the tax statutes and the Medicaid reimbursement program part of the same statutory scheme so as to permit recoupment under the integrated transaction test.

The court would also reach the same conclusion under the "logical relationship" standard. Under the Agreements, the State must reimburse the debtor for services provided to Medicaid beneficiaries. However, the debtor's obligation to pay taxes is not "logically related" to the furnishing of those services. As noted above, those taxes are required of all hospitals operating in Illinois, whether they receive Medicaid reimbursement from the State or not. The fact that the State may have used some of the money from those taxes to attempt to get additional Medicaid funding from the federal government does not create a sufficient nexus to the State's agreement to make Medicaid reimbursements to satisfy the logical relationship test. The cases applying the logical relationship test cited by the State do not support its position. Those cases held that the federal government had the right to recoup for Medicare overpayments, not taxes. *See, e.g., Sims*, 224 F.3d 1008; *In re Univ. Med. Ctr.*, 973 F.2d 1065. Therefore, under either the integrated transaction test or the logical relationship test, the court concludes that the State may not recoup for the taxes owed by the debtor.

### B. Medicaid Overpayments

The State also asserts that it made a small overpayment under the Agreements that it is entitled to recoup. Overpayments under a contract can, in appropriate circumstances, satisfy the "same transaction" test for recoupment. *See, e.g., St. Francis*, 213 B.R. at 719. Daiwa concedes that overpayments may be recouped, but Daiwa, the debtor and Dr. Desnick (collectively, the "responding parties") argue that the State's overpayments do not qualify for recoupment unless they relate to the same year that the reimbursement obligation arose. *See In re Univ. Med. Ctr.*, 973 F.2d at 1082. The *University Medical Center* court based its holding on various federal regulations that it viewed as treating transactions in any one year as "wholly distinct" from transactions in other years. *Id.* at 1079. Those Medicare regulations, which provide for early estimated payments that are later reconciled on an annual basis, do not apply here. IDPA does not make estimated payments that are later adjusted. It apparently makes payments based on each individual beneficiary's claim and then does periodic audits to determine if the payments were correctly

made. Based on an audit of payments made by the State for transactions from July 1, 1997 through June 30, 1999, the State made overpayments of approximately $1,701.19.

The State has not presented evidence regarding the dates and nature of the alleged overpayments or of the payments the State owes the debtor. Also, apparently there are differences in how the hospital and nursing home programs are handled by the State. In light of the court's ruling below permitting setoff of overpayments, this issue may be moot. However, the court will permit the parties to submit additional information if they choose for the court to determine whether the overpayments can be deemed part of the same transaction that gave rise to the debtor's claim against the State.

## IV. Setoff

■ The State also seeks an order lifting the automatic stay so that it can set off the taxes and overpayment the debtor owes it against the amount it owes the debtor for Medicaid reimbursement. Section 553 of the Bankruptcy Code does not create a federal right of setoff but preserves setoff rights existing under state law. *See* 11 U.S.C. § 553(a); *United States v. Maxwell* 157 F.3d 1099, 1102 (7th Cir.1998). To qualify for setoff, a claimant must establish four elements: 1) the creditor holds a claim against the debtor that arose prepetition; 2) the creditor owes a debt to the debtor that arose prepetition; 3) the claim and debt are mutual; and 4) the claim and debt are valid and enforceable. *St. Francis,* 213 B.R. at 715 (citing Lawrence P. King, *Collier on Bankruptcy* ¶ 553.01 (15th ed. rev.)). The court may then weigh equitable factors in determining whether to permit setoff. *See, e.g., In re Lakeside Cmty. Hosp., Inc.,* 151 B.R. 887, 890, 893 (N.D.Ill.1993). In this case, the first two elements are satisfied. It

appears that most, if not all, of the obligations of the State and the debtor arose prepetition. To the extent that any claim arose postpetition, it will not be eligible for setoff.

■ The State also meets the third condition, which requires that the parties' obligations be "mutual." The responding parties initially argued that different state agencies should be treated as separate creditors under the definition of "creditor" in the Bankruptcy Code, relying on *In re Lakeside Community Hospital, Inc.,* 139 B.R. 886 (Bankr.N.D.Ill.1992). However, the Seventh Circuit has held that federal agencies constitute a single entity for purposes of setoff. *See Maxwell,* 157 F.3d at 1102. The *Maxwell* court did not specifically address the definition of "creditor" in the Bankruptcy Code or the court's analysis in *Lakeside,* but it noted that federal courts of appeals have applied the "single-entity" rule for government agencies in bankruptcy proceedings. It then permitted setoff of a debt owed by one government agency against an amount owed by the debtor to another government agency. Although *Maxwell* involved the federal government, there is no basis for a different result with respect to the agencies of the State involved in this case. Therefore, the State satisfies the mutuality element of setoff.

Regarding the fourth element of setoff, that the claim and debt be valid and enforceable, the parties have reserved this issue for a later date. For purposes of this motion, the court presumes without deciding that the debt and claim at issue here are valid and enforceable. Therefore, the State presumably has met the four requirements for setoff under § 553 of the Bankruptcy Code.

Dr. Desnick and the debtor argue that it would be inequitable to permit the State to assert setoff, relying on the *Lakeside*

court's analysis that the unsecured tax claims of IDES and IDR are unfairly elevated to secured status by application of setoff. However, the *Maxwell* court rejected what it viewed as equitable arguments that had the practical effect of repealing the setoff rights preserved in 11 U.S.C. § 553, including the argument that setoff gives creditors who happen to owe money to debtors in bankruptcy an unfair advantage. The court therefore finds that these equitable considerations are not sufficient to outweigh the State's right to setoff.

## V. Priority

Daiwa argues that, even if the State has the right to setoff, Daiwa's perfected security interest in the accounts receivable due from the State is superior to the State's setoff rights. Daiwa argues that Article 9 of the Illinois Commercial Code ("Commercial Code"), 810 ILCS 5/1–101 *et seq.* (West 1993),[1] gives its interest priority, while the State argues that the State Comptroller Act ("Comptroller Act"), 15 ILCS 405/10.01 *et seq.* (West 1993), gives it priority.

### A. Statutes in Conflict

Neither case law nor legislative history shed light on the relationship between the Comptroller Act and the Commercial Code. Both statutes appear to apply in this

1. Because the alleged security interest and priority dispute arose prior to the amending of Article 9 by P.A. 91–893, Section 5, effective July 1, 2001, the recently revised Article 9 does not apply in this case.

2. Section 10.05 provides in relevant part as follows:
Whenever any person shall be entitled to a warrant or other payment from the treasury or other funds held by the State Treasurer, on any account, against whom there shall be any account or claim in favor of the State, then due and payable, the Comptroller, upon notification thereof, shall ascertain the amount due and payable to the

case. Sections 10.05 and 10.06 of the Comptroller Act provide the state with a right of setoff against any amounts owed to a state agency. *See* 15 ILCS 405/10.05–.06. Section 10.05 provides that whenever a party is entitled to payment from the state, and that party also owes money to the state, the Comptroller shall deduct the amount owed to the state and pay only the remaining balance.[2] Section 10.06 provides that "[n]o sale, transfer or assignment of any claim" against the state "shall prevent or affect the right of the comptroller to make the deduction and off-set provided in" Section 10.05. 15 ILCS 405/10.06. Thus, Section 10.06 specifically provides that the assignment of a right of payment from the State does not affect the State's right to setoff under Section 10.05.

On the other hand, assuming that Daiwa has a valid security interest in the accounts receivable due from the State,[3] Article 9 of the Commercial Code applies. Section 9–318 governs priority disputes between an "assignee" and an "account debtor." *See* 810 ILCS 5/9–318(1) (West 1993). The version of Section 9–318 in effect at the relevant time provided as follows:

(1) Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale

State, as aforesaid, and draw a warrant on the treasury or on other funds held by the State Treasurer, stating the amount for which the party was entitled to a warrant or other payment, the amount deducted therefrom, and on what account, and directing the payment of the balance; which warrant or payment as so drawn shall be entered on the books of the Treasurer, and such balance only shall be paid.
15 ILCS 405/10.05.

3. The validity of Daiwa's security interest is another issue the parties have reserved for a later date.

as provided in Section 9–206 the rights of an assignee are subject to

> (a) all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; and
>
> (b) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment.

810 ILCS 5/9–318(1).

▮ Daiwa, as holder of a security interest, qualifies as an "assignee" under Article 9. *See Bank of Waunakee v. Rochester Cheese Sales, Inc.,* 906 F.2d 1185, 1190 (7th Cir.1990). The State qualifies as an "account debtor" under the Commercial Code because it is "a person obligated on an account." 810 ILCS 5/9–102; *see also* 810 ILCS 5/1–102(30) (defining "person" as "an individual or organization"); 810 ILCS 5/1–102(28) (defining "organization" to include a "government or governmental subdivision or agency"). Therefore, if the assignee (Daiwa) notifies the account debtor (the State) of the assignment, the assignee's rights are subject to claims and defenses arising from the contract itself, but not to other claims and defenses of the account debtor. *In re Apex Oil Co.,* 975 F.2d 1365, 1368–69 (8th Cir.1992). Here, Daiwa asserts that it gave the appropriate notice in 1997, so it is not subject to any setoff rights of the State that accrued after that notice was given.

The State makes two types of arguments against Daiwa's position. First, it says that the Comptroller Act controls over Article 9 of the Commercial Code, so it may set off without regard to Daiwa's security interest. Second, it says that even if the Commercial Code applies, it prevails under Section 9–318 for various reasons discussed below.

Regarding whether the Comptroller Act or Article 9 controls, the State first asserts that an Illinois Court of Claims case construing the Comptroller Act is controlling in its favor, and that Illinois rules of statutory construction require the same result. First, the State relies on the Illinois Court of Claims' decision in *Bunn Capitol Grocery Co. v. State,* No. 3608, 1943 WL 3118, at *1 (Ill.Ct.Cl. Mar.9, 1943). In *Bunn Capitol Grocery Co.,* the court held that the statutory predecessor to Sections 10.05 and 10.06 of the Comptroller Act provided the State with a right of setoff superior to the rights of a transferee. *Id.* at *3. However, both the *Bunn Capitol Grocery Co.* decision and the relevant provisions of the Comptroller Act's predecessor, Sections 12 and 13 of An Act to Revise the Law in Relation to the Auditor of Public Accounts ("Auditor Act"), predated enactment of the Commercial Code in 1961. Therefore, that opinion does not control regarding the priority of a secured party under Article 9 of the Commercial Code as against the State. *See Bank of Kan. v. Hutchinson Health Servs., Inc.,* 13 Kan.App.2d 421, 773 P.2d 660, 662 (1989), *aff'd,* 246 Kan. 83, 785 P.2d 1349 (1990) (holding that the State of Kansas' setoff statute did not grant the state a "super-priority" because the statute did not address the rights of a secured creditor).

Second, the State argues that the two acts can be read without conflict in this case if the court incorporates all state statutes into the contract. Under Section 9–318(1)(a), even an assignee who gives notice is subject to the account debtor's claims or defenses arising under the contract (as opposed to "any other claim or defense," i.e., those that do not arise under the contract, which are governed by Section 9–318(1)(b)). The State asserts that the Agreements necessarily incorporate all laws of the State of Illinois, including the Comptroller Act, and that any claims un-

der these laws must be considered claims under the contract for purposes of Section 9–318(1)(a). As discussed more fully below regarding application of Section 9–318 to this case, there is no justification for reading "claims or defenses arising therefrom" so broadly that it would include any claim under any statute that the State could assert.

The court presumes that the State is arguing that the two statutes can be read without conflict based on the principle that courts should construe two statutes in a manner that avoids inconsistency and gives full effect to each statute's provisions whenever reasonably possible. *E.g., In re Marriage of Lasky,* 176 Ill.2d 75, 79–80, 223 Ill.Dec. 27, 678 N.E.2d 1035, 1037 (1997). However, Sections 10.05 and 10.06 of the Comptroller Act and Section 9–318 of the Commercial Code are in direct conflict whenever a secured lender has given the State notice of its security interest before the State's setoff rights accrue. The court must therefore resolve that conflict.

### B. Rules of Statutory Construction

The State next argues that under various principles of statutory construction the Comptroller Act controls over Article 9 of the Commercial Code. Daiwa argues for the opposite conclusion under other rules of statutory construction. Underlying each of the rules of construction is the goal of discerning the legislature's intent. After considering each of these rules in the context of this case, the court concludes that the legislature intended Article 9 of the Commercial Code to control over the Comptroller Act.

One of the most familiar rules of statutory construction is "expressio unius est exclusio alterius." This translates roughly to "the expression of one thing or one mode of action in a statute excludes other things or modes though not expressly prohibited." *Blakeslee's Storage Warehouses, Inc. v. City of Chicago,* 369 Ill. 480, 483, 17 N.E.2d 1, 3 (1938). Section 9–104 specifically enumerates claims and interests excluded from Article 9's otherwise broad application. *See* 810 ILCS 5/9–104 (listing the specific circumstances under which Article 9 does not apply). However, neither Section 9–104 nor its more recent incarnation, *see* 810 ILCS 5/9–109 (West 2001) (enumerating more detailed exceptions to Article 9's applicability), provide any exclusion for the State or any exception for the Comptroller Act or any other statutory right to setoff. *See* 810 ILCS 5/9–102 & –104 (West 1993). Had the legislature intended to except the State's right of setoff from the priority rules established under Article 9 of the Commercial Code, it could have expressly done so.

On the other hand, the legislature specifically included all governmental entities, which includes the State, within the parties governed by the Commercial Code. "Person" under the Commercial Code is defined to include an "organization," which is defined to include a "government or government subdivision or agency." 810 ILCS 5/1–102(28), (30). An "account debtor" under Article 9 of the Commercial Code, who is bound by Section 9–318, is a "person obligated on an account," and therefore includes government agencies. 810 ILCS 5/9–102. The legislature thus specifically included government agencies within the scope of the Commercial Code generally and Article 9 specifically, and it did not exclude government agencies from the laundry list of exclusions from coverage of Article 9 in 810 ILCS 5/9–104. These provisions evidence an intent of the legislature to bind government agencies to the same rules of secured transactions as everyone else.

■ Another rule of statutory construction is that "the more specific controls over the general." *Central Commercial Co. v. Comm'r of Internal Revenue*, 337 F.2d 387, 389 (7th Cir.1964). A variation on this rule is that, to the extent there is a conflict between two statutes, a later, more specific provision prevails over the earlier, more general provision. *See Grenier & Co. v. Stevenson*, 42 Ill.2d 289, 294, 247 N.E.2d 606, 609 (1969). Both of these rules weigh in favor of Article 9 controlling over the Comptroller Act. Sections 10.05 and 10.06 of the Comptroller Act provide the State with a general right of setoff against all claimants. However, Article 9 of the Commercial Code recognizes the special priority rights of a specific class of claimants-secured parties. As the more specific statutory provision, Article 9 should control.

In addition, the Commercial Code was enacted later than the relevant substantive provisions of the Comptroller Act. As the State itself argues, the basic text of Sections 10.05 and 10.06 of the Comptroller Act was enacted as part of the Auditor Act in 1873, and was interpreted by the Court of Claims in the *Bunn Capitol Grocery Co.* decision. The Commercial Code was enacted in 1961. The State argues that the Comptroller Act should be considered the later enactment because the Auditor Act was repealed and Sections 10.05 and 10.06 were re-enacted in the same form when the legislature created the Office of the State Comptroller and assigned all rights, powers and duties of the Auditor to the Comptroller. 15 ILCS 405/22 (West 2001); *see also La Pine Scientific Co. v. Lenckos*, 95 Ill.App.3d 955, 957, 51 Ill.Dec. 241, 420 N.E.2d 655, 657 (1981). The State acknowledges that the operative language of Sections 10.05 and 10.06 has not changed since 1873. The re-enactment of these provisions unchanged in 1973 does not reflect any legislative intent with respect to

whether the Comptroller Act or Article 9 of the Commercial Code should control.

The State also relies on a 1997 amendment to Section 10.05 requiring a pre-setoff notice to the payee. This amendment does not reflect any legislative intent to supersede the Commercial Code, and does not change in any way the relevant text in Section 10.05. Significantly, Section 10.06, which creates the direct conflict with Section 9–318 by referring specifically to transfers and assignments, has not changed since 1873. Therefore, for purposes of applying the rules of statutory interpretation, the Commercial Code should be considered the later enactment that is more specific in nature than the Comptroller Act.

■ Finally, acknowledging that the operative language of the Comptroller Act has not changed in over 125 years, the State invokes yet another rule of construction. When a statute has been given a definitive judicial construction, and is subsequently re-enacted or amended without changing the portion of the statute that was construed, the legislature is deemed to have adopted the prior judicial construction. *See Harris Trust & Savings Bank v. Village of Barrington Hills*, 133 Ill.2d 146, 155, 139 Ill.Dec. 852, 549 N.E.2d 578, 582 (1989). The State asserts that because the operative language of Sections 10.05 and 10.06 has not changed since the *Bunn Capitol Grocery Co.* decision, the prior judicial construction in that case controls. This argument misses the obvious point that *Bunn Capitol Grocery Co.* did not address the conflict between Section 9–318 and Sections 10.05 and 10.06 because no such conflict existed at the time. Therefore, this rule of construction simply does not apply in this case.

■ Application of each of the relevant rules of statutory construction weighs in

favor of finding that the Commercial Code controls over the Comptroller Act when a secured lender has given proper notice of its security interest prior to the time that the right to setoff accrues to the State. This construction is consistent with one of the fundamental goals of the Commercial Code, which is to create a uniform treatment of security interests to promote commerce and freedom of contract. *See* 810 ILCS 5/9–101 cmt. (West 1993). The Uniform Commercial Code is a very important uniform law and is a central feature of Illinois commercial law. The legislators were aware of its significance when it was enacted and its provisions should not be altered without some express indication from the legislature that they intended to vary its terms. The provisions of a little-known statute enacted 125 years ago should not control over one of the most significant uniform laws affecting commerce in this country without some indication from the legislature that this was their intent.

### C. Section 9–318(1)(a)

The court must now determine whether Daiwa is entitled to the debtor's Medicaid reimbursements under Section 9–318(1). Section 9–318(1)(a) provides that an assignee's right to an account receivable is subject to any defense or claim arising from the contract. Both of the Agreements require the debtor to comply with state and federal law. Paragraph 5 of the Participation Agreement provides that the debtor will "comply with Federal standards specified in Title XIX of the Social Security Act and also with all applicable Federal and State laws and regulations." The Long Term Agreement provides that the debtor will comply with all rules and regulations for nursing facilities, federal requirements of the Social Security Act and "all applicable Federal and State laws and regulations," including but not limited to various requirements specific to nursing and other medical facilities.[4]

■ The State argues that, because of these references to "applicable … State laws," its claims for taxes arise under the contract for purposes of Section 9–318(1)(a). However, the contracts should not be read so broadly. Under the State's reasoning, any claim under any statute would be treated as part of the contract. Both agreements refer to compliance with federal and state laws in the context of the statutes, rules and regulations regarding the operation of medical facilities. They cannot be fairly read to incorporate into the contract a setoff claim for any failure to comply with any state or federal statute, whether it relates to performance of the contract or not. In addition, both contracts require the debtor to "comply" with state law, and the use of this verb imposes a limitation. To the extent the State is attempting to incorporate the various setoff statutes into the Agreements, its argument fails because those statutes do not create obligations with which the debtor

---

4. The Long Term Agreements provides as follows:

The Facility must, on a continuing basis, comply with: the current rules and regulations for nursing facilities, Federal requirements specified in Title XIX of the Social Security Act and its implementing regulations; all applicable Federal and State laws and regulations including, but not limited to the requirement that facilities must maintain written policies, procedures and materials concerning advance directives and give written information to all adults concerning their rights under State law to make decisions about their medical care; requirements set forth in the Provider Handbook; and the policies and procedures of the Illinois Department of Public Aid, including procedures of the Department for carrying out the approved Inspection of Care Reviews.

must comply. Instead, they confer rights upon the State. Finally, the State chose to include in both Agreements a specific setoff provision for only one type of setoff claim—overpayments. Paragraph 12 of the Participation Agreement specifically provides the State with the right to "recover any overpayments by setoff," and the Long Term Agreement contains similar language. No other setoff rights are included in the Agreements. The State chose to preserve its setoff rights for overpayments but not for other types of claims, and cannot now in effect modify the Agreements to add all the other potential setoff rights it failed to include when the Agreements were made.

The State fails to cite a single case in which the obligation to pay taxes was allowed as a setoff under a similar contract. The only case the State cites to support its argument that its setoff rights relating to taxes are claims or defenses arising under the Agreements for purposes of Section 9–318(1)(a) is *In re Metropolitan Hospital*, 131 B.R. 283 (E.D.Pa.1991). However, the *Metropolitan Hospital* case was not decided under Section 9–318(a)(1). Although the court referred to Section 9–318(a)(1) at one point in the decision, it referred to Section 9–318(a)(2) in holding that the U.S. Secretary of Health and Human Services was entitled to set off an overpayment under 42 U.S.C. § 1395g. Section 1395g is the provision under which providers get paid. It requires the Secretary to periodically determine the amount to pay providers and then adjust that amount for previous overpayments or underpayments. The

court held that this statutory limitation "legally bound these assignees under Section 9–318(a)(2)." *Id.* at 290. Thus, the court did not rest its decision on Section 9–318(a)(1), and there is no mention that the secured parties gave notice to the Secretary of their security interest required by Section 9–318(a)(2).[5] Perhaps more importantly, the *Metropolitan Hospital* court did not address the setoff of taxes against Medicare payments, but instead allowed only setoff of the overpayment of Medicare payments under § 1325g. This decision does not support the State's argument that its setoff claims for taxes are claims arising under the contract for purposes of Section 9–318(a)(1).

For all of these reasons, the State's claims for taxes will not be considered claims arising under the contract for purposes of Section 9–318(a)(1). However, as noted above, the Agreements did include specific rights to setoff for overpayments. Therefore, the State is entitled to set off those overpayments under Section 9–318(a)(1) without regard to Daiwa's security interest in the Medicaid receivables.

### D. Section 9–318(1)(b)

The court must next determine whether Daiwa has complied with the requirements of Section 9–318(1)(b). Subsection (1)(b) provides that an assignee's right to an account is subject to "any other defense or claim" that accrues prior to notification of the account debtor of the assignment. 810 ILCS 5/9–318(1)(b). The assignee's interest in the account is superior to any claim or defense that accrued after the notifica-

---

**5.** In addition, the *Metropolitan Hospital* court seems to suggest that, for an account debtor to give effective notice under Section 9–318(a)(2) in cases involving the Medicare program, an assignee must give notice before the enactment date of § 1395g (which was in 1965). However, Section 9–318(a)(2) focuses on the dates that the claims and defenses

"accrue" and the date the account debtor receives notice of the assignment. The date of enactment of a statute creating a right to setoff should not be viewed as the date of accrual of the claims. Rather, accrual occurs when an obligation is "actually due and payable or when a cause of action exists." *Bank of Kan.*, 246 Kan. 83, 785 P.2d 1349, 1355.

tion. The critical issue, then, is determining when the State received notice of the assignment pursuant to Section 9–318(1)(b).

Daiwa argues that the filing of a financial statement with the Secretary of State provided the State with adequate notice of its assignment. Alternatively, it argues that the letter it sent to the Office of the State Comptroller on July 1, 1997 provided the State with adequate notice. The State, however, argues that the filing of a financing statement does not constitute "notice" under Section 9–318(1)(b). It also argues that actual, not constructive notice is required. The State does not contest the adequacy of the content of the July 1, 1997 letter. It argues, however, that any notice should have been sent to IDPA and not the Comptroller. Therefore, it argues that actual notice was not received until the bankruptcy filing on April 17, 2000, at which time Daiwa sent a supplemental notification letter directly to IDPA.

 "Notice" under Section 9–318(1)(b) means actual notice, not constructive notice. Therefore, the filing of a financing statement is not sufficient notification of assignment for an account debtor. *See In re Alliance Health of Fort Worth, Inc.*, 240 B.R. 699, 704 (N.D.Tex.1999); *Chase Manhattan Bank v. State,* 40 N.Y.2d 590, 388 N.Y.S.2d 896, 357 N.E.2d 366, 368 (1976). However, a notification to the Comptroller is adequate notice. *See Chase Manhattan Bank v. State,* 48 A.D.2d 11, 367 N.Y.S.2d 580, 584 (N.Y.App.Div.1975), *aff'd,* 40 N.Y.2d 590, 388 N.Y.S.2d 896, 357 N.E.2d 366 (holding that demand for payment from comptroller constitutes actual notice under Section 9–318). The court has already held that the State is a single creditor for setoff purposes. Courts have also considered the State a single entity for accounting purposes. *See Lakeside Cmty. Hosp., Inc.,*

151 B.R. 887, 890. Since the Comptroller is responsible for making the Medicaid reimbursement payments owed to the debtor, and is also responsible for setting off payments owed to the State under the Comptroller Act, a letter to the Office of the State Comptroller is a reasonable means of notifying the State of Daiwa's rights in the debtor's accounts receivable. Therefore, any right of the State to setoff accruing prior to the July 1, 1997 letter has priority over Daiwa's security interest in the accounts receivable. However, any right to setoff accruing after receipt of the letter is subordinate to Daiwa's security interest in those accounts.

It is unclear from the parties' submissions whether any of the State's setoff rights arose prior to July 1, 1997. The court will therefore reserve for later determination the amounts the State may set off against the payments it owes the debtor.

## VI. Conclusion

For the foregoing reasons, the State's request to recoup the remaining amounts owed by the debtor against the Medicaid reimbursement payments due to the debtor is denied. The parties are given leave to present additional information regarding recoupment with respect to overpayments. The automatic stay is lifted to allow setoff of overpayments owed to the State and tax debts that accrued prior to receipt of Daiwa's letter dated July 1, 1997. However, the stay is not lifted to allow setoff of taxes that accrued after the July 1, 1997 notification.

### ORDER

**IT IS ORDERED** that a Corrected Memorandum Opinion is entered this date (with minor grammatical and typographical corrections, but no changes of substance) and is entered retroactive to

January 17, 2002, the date the original Memorandum Opinion was entered.

**IT IS FURTHER ORDERED** that the time for filing any additional information regarding the recoupment overpayment issue remains twenty-one (21) days from January 17, 2002, the date the original Memorandum Opinion and Order were entered.